Clemens POGGEMOELLER et al.,
Respondents,

v.

INDUSTRIAL COMMISSION of Missouri, DIVISION OF EMPLOYMENT SECURI-TY, and all Corporate Defendants except Mid-Wood Motors, Inc., and George Pappas Ford Center, Inc., Appellants.

No. 31222.

St. Louis Court of Appeals.

Missouri.

Sept. 17, 1963.

Motion for Rehearing or Transfer to Supreme Court Denied Nov. 6, 1963.

Harold S. Cook, St. Louis, for all corporate defendants except Mid-Wood Motors, Inc., and George Pappas Ford Center, Inc. Cook, Murphy & English, St. Louis, of counsel.

Lloyd G. Poole, Jefferson City, for Industrial Commission of Missouri.

George Schwartz, Jefferson City, for Division of Employment Security.

Claude W. McElwee, St. Louis, for respondents.

RUDDY, Acting Presiding Judge.

This is a proceeding for unemployment compensation under Chapter 288, RSMo 1959, 15 V.A.M.S., (Employment Security Law) and our review is limited to an interpretation and application of the provisions of § 288.040, subd. 4. The Circuit Court found in favor of claimants and this appeal followed.

Claims for unemployment compensation were filed by a large number of claimants (respondents herein), all members of the Automotive, Petroleum and Allied Industries Employees' Union, Local No. 618, for alleged unemployment between June 8, 1959, and August 17, 1959. The claimants were employees of a large number (approximately 88) of automobile dealers and auto body shop owners located in the City and County of St. Louis. These dealers and auto body shop owners were members of an organization known as the Greater St. Louis Automotive Association, Inc. The claimants worked in the service and parts departments of the said dealers and auto body shop owners. The automobile mechanics and other employees who did repair work in the shops of the employers were members of another Union, namely, District No. 9, International Association of Machinists, and at times throughout the record their Union organization was referred to as Local No. 777.

A deputy of the Division of Employment Security denied benefits to each of the claimants after a determination that claimants were ineligible because of a stoppage of work due to a labor dispute, giving as a supporting reason that the unemployment was caused by a lockout due to a dispute over provisions of a new contract being negotiated by the Greater St. Louis Automotive Association, Inc., and jointly by Local 618 and District No. 9. The deputy further found that inasmuch as the contract under which the claimants worked was at issue, they were found to be directly interested in the labor dispute. Each of the claimants took an appeal from this determination of the deputy.

After a hearing the Appeals Tribunal for the Division of Employment Security affirmed the determinations of the deputy of the Division and denied benefits to each of the claimants and made extensive factual Findings.

Thereafter, the Appeals Referee set out the provisions of Sec. 288.040, subd. 4, supra, (Employment Security Law) and then, among other findings, made the following:

"* * * Clauses (a) and (b) quoted above refer to participating in, or financing or interest in a labor dispute and do not refer to participating in, or financing or interest in a strike or lockout. An individual is participating in a dispute when he takes part in a dispute either in person or through his rep-

resentatives. An individual is interested in a dispute when he stands to gain or lose by the outcome of the dispute.

"The Referee finds that the employers through the labor committee of the Association, and the claimants through the representatives of their respective unions were engaged in a controversy concerning the terms and conditions of employment of all of the claimants, which controversy constituted a labor dispute, that the labor dispute caused stoppages of work from June 9, 1959 to August 16, 1959, inclusive, in each of the employer's premises in which the claimants were last employed; and that the claimants' unemployment during that period was due to such stoppages of work. So long as the stoppages of work resulted from a labor dispute it makes no difference whether the stoppages were brought on by the action of employees in calling a strike, or as in these cases by the action of the employers in closing their service and parts departments and locking out their employees.

"Representatives of District No. 9 and representatives of Local 618, on behalf of their respective members, took part together in negotiations with the labor committee of the Association. Such negotiations concerned the terms and conditions of employment by each of the employers herein, of members of District No. 9, and members of Local 618. The Referee, therefore, finds that all of the claimants participated through their respective union representatives in the dispute which caused the stoppages of work, and that all of them were interested in the labor dispute which caused the stoppages of work. The claimants are, therefore, ineligible for benefits for any week in the period beginning June 9, 1959 and ending August 16, 1959, for which they have filed claims."

The claimants filed an application for a review of the decision of the Appeals Tribunal with the Industrial Commission of Missouri.

The Commission denied the application of the claimants for review, holding, "that the Findings of Fact of the Appeals Tribunal are supported by competent and substantial evidence in that the decision of the Appeals Tribunal was made in accordance with the Law."

The claimants, pursuant to authority given them under Section 288.210 RSMo 1959, 15 V.A.M.S., filed a proceeding in the Circuit Court of St. Louis County for a judicial review of the decision of the Industrial Commission.

The Circuit Court found in favor of claimants and remanded the cause to the Commission for further proceedings not inconsistent with the declarations of law made by the court. Many of the findings of fact made by the court in its decision were the same as those found by the Referee of the Appeals Tribunal. In its Conclusions of Law, among others, it found that:

" * * * This court does not consider this appeal to be a factual decision by the Commission.

"These determinations by the deputy and the Appeals Tribunal are not factual determinations, but conclusions of law on subjects not yet passed upon by judicial determination. Therefore, this Court does not feel that it is bound by such findings of the Tribunal or deputy. The Court concedes there was a stoppage of work which existed because of a labor dispute. A strike called by District No. 9 and subsequent 'lockout' enforced by members of the Association. Notwithstanding the above concession, the Court feels that claimant is entitled to benefits under our Employment Security Law.

* * * * * *

"* * * The only thing that Local 618 participated in was the contract discussion which started prior to the termination of the contract on June 1, 1959. They continued to work *without a contract* after June 1, 1959. On June 8, 1959, the members of Local 618 were advised to report to their place of employment on June 9, 1959, indicating their willingness to work and not participate in any work stoppage. There is no evidence that Local 618 had contributed financially to the work stoppage or the strike and subsequent picketing. Under these circumstances, those claimants of Local 618 should not be disqualified on the grounds that they 'participated in' the labor dispute.

"This Court, therefore, concludes that Local 618 was not 'directly interested' in the work stoppage even though they participated in the negotiations with the Association and benefited by the contract that resulted. They (618) did not strike, did not picket, indicated their willingness to work, and were powerless to avert either the strike by District No. 9, a separate and distinct Union, and were powerless to avert the subsequent 'lockout' caused by the employers.

"This Court takes a different view as to whether it makes any difference if the work stoppage was caused by the employee, by virtue of a strike, or by virtue of the employers when they 'locked out' the employees.

* * * * * *

"Since Local 618 was powerless to avert the strike by District No. 9, and powerless to avert the 'lockout' by the employers, and Local 618 indicated its willingness to work, this claimant should be entitled to recover benefits.

* * * * * *

"This Court has purposely refrained from commenting upon Sec. 288.140.4 (b) [288.040, subd. 4(b)] RSMo 1959. The parties by their stipulation indi-cate that all of Section 288.040.4 RSMo 1959 is for the Appeals Tribunal's consideration. The parties, obviously, did not try the case or any aspect of it regarding Section 288.040.4(b) RSMo 1959. The Appeals Tribunal Referee apparently did not consider it, in view of the fact that he made no reference to any 'class' or 'grade' of workers in his decision. The Poggemoeller case, as stipulated, is to represent all claims for Local 618. To assume that all claimants thereunder fall into the same class or gradation assumes a fact not supported by the evidence. One of the employees mentions different wage scales for different classes of workers. The Court, therefore, treats the point as abandoned, * * *.

"The Court, therefore, remands this cause to the Commission for further proceedings not inconsistent with the declarations of law made by the Court."

The Industrial Commission of Missouri, the Division of Employment Security, and all the employers except two appealed from the judgment entered in the Circuit Court reversing the action of the Industrial Commission.

For the sake of brevity and convenience, we will adopt the same references to some of the parties as used by the appellants and the respondents in their briefs. The appellant, Industrial Commission of Missouri, will be referred to as the Commission; the appellant, Division of Employment Security, will be referred to as the Division; the Employer Appellants will be referred to as Employers; the Greater St. Louis Automotive Association, Inc., will be referred to as the Association; District No. 9 (or Local No. 777), International Association of Machinists, will be referred to as District No. 9; and the Automotive Petroleum and Allied Industries Employees' Union, Local 618, will be referred to as Local 618.

The only claim heard by the Appeals Tribunal of the Division was that of Robert

L. Cole. Cole filed a separate suit for judicial review and is not a party to this appeal. However, it was stipulated and agreed by all the parties concerned that the transcript in the Cole case could be used in this case because of the similarity of proof that would be adduced in support of each claimant's claim. All of the claimants filed similar claims.

The Association was authorized to conduct negotiations with District No. 9 and Local 618 for each member-employer but had no authority to execute any labor contracts for the members. The members of the Association through their Labor Relations Committee made up of members of the Association and the Executive Vice-President of said Association have dealt with and negotiated with the two Unions for approximately twenty years. Contracts of employment similar to the one that terminated June 1, 1959, have been executed by each employer separately and in each case executed by both Local 618 and District No. 9 jointly. All of the contracts have been signed jointly by both Unions and many of the provisions of the past contracts, as well as the one that terminated June 1, 1959, have applied equally to all employees whether members of District No. 9 or of Local 618. The last of these agreements executed by the two Unions covered the period beginning June 1, 1958, and ending June 1, 1959. As stated, this agreement contained some provisions that applied to members of both Unions employed by the employers and it also contained a separate article covering wages, hours and conditions of employment applicable to members of District No. 9 and a separate article covering wages, hours and conditions of employment applicable to members of Local 618. This agreement, similar to those that preceded it, was signed individually by each employer and was signed jointly by a representative of District No. 9 and a representative of Local 618. The agreement contained a provision that it shall automatically renew itself, unless either party thereto shall give notice to the other party of a desire to revise, amend, or terminate the agreement, sixty days before the expiration date of the agreement.

On March 25, 1959, the Labor Relations Committee of the Association and E. M. Hayward, Executive Vice-President of the Association, sent letters to District No. 9 and Local 618 and the members of both Unions, wherein notice was "given of the termination of the agreement on its present expiration date." This notice stated that it was given on behalf of all of the members of the Association who were parties to the Labor Agreements. Enclosed with the letters was a copy of the proposed changes and additions for a new contract for the consideration of the officers and membership of both Unions. Contained in the letters sent to the Unions was the following statement:

"We are ready to meet with your Representatives at an early date for the purpose of negotiating a new agreement. We, of course, reserve the right to alter our proposal upon receipt of any counter proposals from the Unions."

The changes and additions proposed included an offer of a wage increase; increased vacation time for certain employees; and a grievance procedure and a plan by which the employee would be guaranteed a five day work week but would permit the employer to keep his shop open on Saturdays without penalty.

On March 27, 1959, a letter signed jointly by the representatives of the District No. 9 and Local 618 was sent to each one of the employers and in the letter both Unions served notice that they were terminating the Labor Agreements and enclosed a copy of proposed changes and additions for the consideration of the employers. Contained in the letter was the following statement: "We are ready to meet with you or your representative at an early date for the purpose of negotiating a new agreement." Attached to the letter signed jointly by the two Unions were the

proposed changes submitted to the employers. Among the proposed changes applicable to Local 618 was a proposal that concerned Pension Trusts and provided that each employer shall contribute to a Pension Fund the sum of $4.00 a week for each employee who has been on the payroll thirty days or more.

Thereafter, the Labor Relations Committee of the Association entered into negotiations with the representatives of the two Unions. Six or seven of the meetings with the representatives of the two Unions were held in the office of the Association until May 12, 1959. Thereafter, the negotiations were resumed in the office of the Federal Mediation and Conciliation Service. These meetings continued until on or about July 2, 1959. At all of the meetings representatives of the two Unions were present. The negotiations concerned wages, working conditions and pensions.

On April 20, 1959, the officers of both Unions, District No. 9 and Local 618, filed a notice with the Federal Mediation and Conciliation Service stating that "a dispute exists" with the employers.

At the meeting held July 2, the attorney for Local 618 "read into the record" of the meeting and handed to the Executive Vice-President of the Association, a letter signed by the officers of Local 618 wherein they stated that they were speaking only for Local 618 and not for any other labor organization and further stated:

"We have concluded that an impasse has been reached in collective bargaining between our organization and the Greater St. Louis Automotive Association, Inc. The inability of our union and the Association to narrow the issues involved to an area within which it is reasonable to hope for a final agreement convinces us that we have reached a real deadlock and that further collective bargaining is a hopeless undertaking. For this reason we now inform you of our intention to terminate and break-off collective bargaining and we shall not hereafter meet with you for that purpose except under the circumstances hereafter mentioned."

The letter was concluded with the statement that Local 618 would explore the possibilities of reaching individual agreements with each of the employers and that Local 618 would not otherwise engage in future collective bargaining with the Association. A copy of this letter was sent to all of the employers.

On June 3, 1959, District No. 9, sent a letter to Mr. Ed Hayward, Executive Vice President of the Association, similar in effect to the letter read into the record by the attorney for Local 618. In addition, the letter from District No. 9 stated, "We are hereby notifying you that before any particular dealer is struck, such dealer will be given a minimum of forty-eight (48) hours' notice by the Union."

On June 4, 1959, District No. 9 was advised by letter from Edward Hayward, Executive Vice President of the Association, that the Association did not recognize any right on the part of the Union to negotiate individually with any of the members represented in the negotiations, stating, "The bargaining has been on a multi-employer basis and it is intended that it be continued on that basis." On July 3, 1959, the Association through its Executive Vice President answered the letter of Local 618 dated July 2, 1959, which had been read into the record and had been forwarded to each one of the employers. The effect of the Association's letter was to point out that over the years and also during the current negotiations the two Unions had negotiated jointly on behalf of the employees represented by the two Unions and all past labor agreements have been executed jointly by the two Unions. The letter concluded with the following statement, "Under these circumstances and until a change of the joint bargaining status of the two unions is accomplished in a lawful manner, the

Association does not recognize any right on the part of your union to negotiate separately and apart from the Machinists Union."

Thereafter, the Association continued to negotiate with both unions and these negotiations continued throughout the period of the strike, which will be referred to later, and until a settlement of the labor dispute was reached on August 14, 1959. All of the negotiations were participated in jointly by the two Unions with the exception of one meeting held July 16, 1959. On that occasion the representatives of Local 618 would not attend the meeting. They were in a separate room in the Conciliation Office. The Association, through its Labor Relations Committee, informed the representatives of Local 618 that it refused to participate in negotiations without both unions being present. Thereafter, joint meetings were held with Local 618 and District No. 9 until the settlement was reached.

Carl Gibbs, Assistant Business Representative of Local 618, testified that the meetings were held jointly with representatives of District No. 9 and Local 618 and stated that after the meeting of July 16, they continued to be held jointly and that he was present at the meeting on or about August 14, which led to the settlement of the labor dispute. This witness, when questioned about his activities as a participant at the meetings, was asked, "You were not just negotiating for one particular place" and he answered, "No."

The minutes of the various meetings held during the negotiations were offered and admitted in evidence solely for the purpose of showing who was present at the meetings and these minutes show that a representative or representatives of Local 618 were in attendance at all meetings, with the exception of the meeting held July 16.

On June 8, 1959, seven employers were struck by District No. 9. These employers were all members of the Association. District No. 9 established picket lines at the places of business of the seven employers. No strike was called or engaged in by Local 618 or by any of its members. None of the claimants was employed at any of the places of business of the seven employers where the strike was called and the picket line established by District No. 9 and its membership. No strike was called or engaged in and no picket line was established by District No. 9 against any other employer member of the Association except the seven referred to. None of the members of Local 618 who were employed at any of the places of the employers that were struck are claimants herein. It should be noted that at one time they were claimants and dismissed their claims in the course of the hearing before the Appeals Tribunal.

At the close of business on June 8, 1959, the employers of the claimants herein read a notice to their employees, members of Local 618 and District No. 9, and posted a copy of the notice on the employees' bulletin board in the places of business of the various employers. This notice informed each employee that the employees in the Service and Parts Department were being laid off temporarily at the close of business on June 8, 1959. The notice further stated,

"This layoff is the result of a labor dispute between the Machinists Union Local 777—Teamsters Local 618 and the Greater St. Louis Automotive Association, Inc., of which we are a member.

"The members of the Association, acting as a group through their labor relations committee, have dealt and made contracts with the Unions for over twenty years. The negotiations for new contracts have in our opinion broken down over only one real issue— the demands of the Unions for contributions to their pension fund. All other issues have either been settled or could be quickly settled if pensions were out of the picture. * * *"

The notice informed the employees that the strike called against some of the members of the Association was regarded as a strike against all of the members of the Association who were represented in the negotiations with the unions. Thereafter, commencing on June 9, 1959, and until August 17, 1959, the employers closed their Service and Parts Departments and no work therein was available to the employees and to the claimants in this case who were members of Local 618. Prior to the closing of their places of business it had been agreed by the members of the Association that in the event any of the members was struck the others would lock out to support the action of the Labor Relations Committee of the Association and would act in unison and would defend their right to collective bargaining. Negotiations between the Labor Relations Committee of the Association and the two Unions continued after the strike was called and pickets were placed at the establishments of the seven members of the Association, and after the lockout by the employers of the claimants herein.

On the afternoon of June 8, Local 618 sent notices to the Shop Stewards at each employer's place of business informing them that District No. 9 had struck seven places of business of the employers that morning and that Local 618 was not on strike at these locations. The notice also informed the stewards that Local 618 was reliably informed that the employers who were affiliated with the Association would lock out the union members beginning Tuesday morning, June 9, and requested all of them to report to the union office immediately for instructions and advice and told them that failure to report may mean the loss of "benefits to you." All of the claimants appeared for work at the places of their respective employers on the morning of June 9, ready and willing to work but found the doors to the places of employment locked.

On June 9, 1959, a letter signed by the officers of Local 618 and addressed to all of the employers of members of Local 618 informed the employers that members of Local 618 were not on strike. Contained in the letter is the following statement:

"PENSIONS HAVE NEVER BEEN A MUST with Local 618 to effect a settlement. It is quite true at the last meeting our proposal did include a pension request, but we did not discuss the type, cost, etc. We did offer a guarantee that if a pension were established in the contract, there would be no increase in contributions by the employers for a period of (5) years. * * *"

The letter further informed the employers that Local 618 had resisted from the very first the proposal for percentage wage increases offered by the Association, stating that this has never happened in the past and that the Local 618 had no instructions from their membership to agree to such increase. They further stated that they believed this method was inequitable and sets up unfair differentials between job classifications. They concluded the letter with an offer to continue negotiations.

On the same day, namely, June 9, 1959, each employer of the claimants herein placed on the doors of their places of business a sign which read, "Service and Parts Departments closed by reason of a labor dispute between the Greater St. Louis Automotive Association of which we are a member" and District No. 9 and Local 618.

Mr. Hayward testified that in a meeting held June 4, 1959, Mr. Melroy Horn, President and Business Representative of Local 618 presented a proposal "* * * for a Monday through Saturday work week by mutual agreement, employers option, certain inequitable adjustments in 618 employees; general increase of 10¢ an hour for a three year contract, and a pension plan effective September 1, 1960, ten cents an hour."

The attorney for the claimants in his cross examination of Mr. Hayward asked, "Now, isn't it true that the pension plan that

was proposed at that first meeting was proposed by the Machinists and not by Local 618?" and the witness answered, "No, sir, that is not true. The actual things we have in evidence show for themselves. The proposal is in evidence, * * *." Later when the attention of this witness was called to the letter of June 9, 1959, sent by the officers of Local 618 to all the employers he was asked if he did not have knowledge that the position of Local 618 was that their proposal at the last meeting did not include a pension request and he answered, "I know that in the last meeting prior to the strike District 9 and 618, made a request for a pension in their proposal. I read it in the record here." Mr. Lester P. Francis, owner of the Francis Chevrolet Company, a member of the Association and a member of the Labor Relations Committee, testified, that the representatives of District No. 9 and Local 618 negotiated concerning a new contract, wages, conditions with respect to other clauses and a pension plan.

All of the claimants knew that the representatives of Local 618 were negotiating a new contract for them and knew that the negotiations concerned the wages, hours and working conditions of their employment.

Carl Gibbs, Assistant Business Agent of Local 618, testified, that three or four years prior to the hearing, by a vote of the membership, Local 618 established a fund from which payments could be made to members when on strike or when locked out from their employment. The fund was created by increasing the dues $1.00 which was placed in a fund for use during a strike or lockout. Following the lockout by the employers of claimants herein, each claimant received $30.00 a week from this fund with the exception of those who obtained temporary employment, in which event they were paid the difference between $30.00 and the wages received. They were not required to perform any services for the money received. It was stipulated and agreed by all of the parties that claimants did not personally contribute anything financially to the strike.

There was no contract in existence between the employers and District No. 9 and Local 618 between June 1, 1959, and August 15, 1959.

On August 14th a settlement of the labor dispute was reached by the parties and the settlement was ratified by the employer members of the Association on August 15 and by the membership of District No. 9 on August 16th and by the membership of Local 618 on August 17th. The agreement provided that each employer would execute a separate contract with each union and that there would be no joint contract as heretofore existed. The contract with Local 618 provided for wage increases and a pension plan.

The claimants when filing their claims for benefits gave as their reason for their separation from employment, a "labor dispute."

As stated in the beginning of this opinion we need only concern ourselves with subsection 4 of Section 288.040 RSMo 1959, 15 V.A.M.S., in ruling on the issues presented by this appeal. Said subsection provides as follows:

"4. (1) A claimant shall be ineligible for waiting week credit or benefits for any week for which the deputy finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed; provided, that in the event he secures other employment from which he is separated during the existence of the labor dispute, he must have obtained *bona fide* employment as a permanent employee for at least the major part of each of two weeks in such subsequent employment to terminate his ineligibility; and provided further, that if in any case separate

branches of work which are commonly conducted as separate business at separate premises are conducted in separate departments of the same premises, each such department shall for the purpose of this subsection be deemed to be a separate factory, establishment or other premise; and provided further, that this subsection shall not apply if it is shown to the satisfaction of the deputy that

"(a) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(b) He does not belong to a grade or class of workers of which, immediately preceding the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute.

"(2) 'Stoppage of work' as used in this subsection means a substantial diminution of the activities, production or services at the establishment, plant, factory or premises of the employing unit."

The order of the Commission denying the claimants' applications for review in effect made the decision of the Appeals Tribunal its own decision for the purpose of judicial review under the provisions of Section 288.200 RSMo 1959, V.A.M.S.

■■■ The order of the Commission affirming the decision of the Appeals Tribunal is subject to review by the Courts to determine whether it is "authorized by law" · and whether it is "supported by competent and substantial evidence upon the whole record." Constitution of Missouri 1945, Art. V, Sec. 22. The reviewing court cannot substitute its own judgment for that of the administrative tribunal. The duty of the reviewing court is to determine whether the tribunal reasonably could have made its findings and reached its results upon consideration of all of the evidence before it and to set aside decisions clearly against the overwhelming weight of the evidence. In determining the sufficiency of the evidence it must be considered in the light most favorable to the findings, together with all reasonable inferences that may be drawn therefrom that seem to support it, and the court must disregard all opposing and unfavorable evidence. The Commission's findings of fact are conclusive if supported by substantial evidence. Kansas City v. Rooney, 363 Mo. 902, 254 S.W.2d 626; Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136; Donnelly Garment Company v. Keitel, 354 Mo. 1138, 193 S.W.2d 577; Meyer v. Industrial Commission of Missouri, 240 Mo.App. 1022, 223 S.W.2d 835; Union May-Stern Company v. Industrial Commission, Mo.App., 273 S.W.2d 766; Dittmeier v. Missouri Real Estate Commission, Mo.App., 237 S.W.2d 201.

■■ Section 288.210, the statute that forms the basis for judicial review of the decision of the Industrial Commission, provides, in part, that in any judicial proceeding under the section, the findings of the Commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law. Under the statute and the cases just cited it is clear that it is not the function of this court to make its own findings as to the facts. Insofar as the facts are concerned, it is our duty to determine if the decision of the Commission is supported by substantial evidence in the record.

Claimants contend the trial court properly held that determinations by the deputy and the Appeals Tribunal are not factual determinations but conclusions of law on subjects not yet passed upon by judicial determination in this state. We cannot agree with this statement of claimants. We agree that sometimes it becomes difficult to distinguish between factual determinations and conclusions of law. We think the dis-

tinction between the two is clearly stated in a case cited by the Commission and the employers.

In the case of Henzel v. Cameron, 228 Or. 452, 365 P.2d 498, the Supreme Court of Oregon decided that the matter of whether unemployment compensation claimants were "directly interested" in a labor dispute was a question of fact and not a question of law. In discussing this question the court stated:

"Whether a finding is a 'finding of fact' or a 'conclusion of law' depends upon whether it is reached by natural reasoning or by fixed rules of law. Where the ultimate conclusion can be arrived at only by applying rules of law the result is a 'conclusion of law.' * * A 'finding of fact' is a conclusion drawn by way of reasonable inference from the evidence. * * *

"There are no rules of law to be applied in determining whether or not these claimants were directly interested in the labor dispute. Such a determination can be arrived at only by an examination of the facts. Therefore, when the commissioner found that the claimants were 'directly interested' in the labor dispute which caused their unemployment, he had made a 'finding of fact' based on the evidence, and not 'a conclusion of law.'

"Further, the commissioner, in finding that the claimants were directly interested in the labor dispute, also found by necessary implication that the claimants had not sustained the burden of proof placed upon them by ORS 657.-200(3) to show that they were not directly interested. This, likewise, is a finding of fact. * * *

\* \* \* \* \* \*
" * * * The finding of fact by the commissioner that the claimants were 'directly interested' in the labor dispute, since supported by substantial evidence, is conclusive upon the re-

viewing court." (365 P.2d l. c. 503, 504.)

The trial court's conclusion that there were no issues of fact before the Appeals Tribunal and that it had no factual findings to make is erroneous as will be demonstrated. The fact that the issues before the Appeals Tribunal have not as yet been passed upon by "judicial determinations" in this state could not in any way cause findings in connection with a purely factual situation to become conclusions of law.

Whether or not the Association and the claimants through the representatives of their respective Unions were engaged in a controversy concerning the terms and conditions of employment of all of the claimants and whether or not the controversy constituted a labor dispute which caused stoppages of work from June 9, 1959, to August 16, 1959, inclusive, and whether or not the claimants' unemployment during that period was due to such stoppages of work are facts that must be found from the evidence upon an examination of the whole record, together with all reasonable inferences that may be drawn from the evidence in the record. Also, whether or not the claimants participated through their respective union representatives in the dispute which caused the stoppages of work and whether or not claimants were directly interested in a labor dispute which caused the stoppages of work are questions of fact requiring findings that could only be obtained from the evidence and could only be reached by natural reasoning.

Claimants cite the case of Collins v. Reed-Harlin Grocery Co., Mo.App., 230 S.W.2d 880, at l. c. 887, wherein the court said:

"Under the new Constitution, the appellate courts are no longer bound by the findings of fact and the conclusions of law made by the Commission but we are empowered to examine the record to determine for ourselves whether or not there is sub-

stantial evidence to support the findings of the Commission and whether or not the Commission has followed the law."

The statement just quoted does not conflict in any degree with what we have said.

Claimants also cite Howell v. Division of Employment Security, 240 Mo.App. 931, 222 S.W.2d 953, as authority for the holding that this court can and must determine whether the decision and findings of the Appeals Tribunal are authorized by law. We said earlier that the decision of the Appeals Tribunal is subject to review by this court to determine whether it is "supported by competent and substantial evidence upon the whole record" and whether it is "authorized by law." There isn't any doubt but that our review shall include the determination whether the decision and findings made by the 'Appeals Tribunal are authorized by law.

The section of the statutes under review makes a claimant ineligible for benefits for any week for which the deputy finds that his unemployment is due to a stoppage of work which exists because of a labor dispute in the premises in which he was last employed.

It is interesting to note that this part of the statute requires the deputy to find that the unemployment is due to a stoppage of work which exists because of a labor dispute. Certainly such a finding can only be made after a thorough analysis of the evidentiary facts presented before the deputy. Obviously, the finding called for is one of fact.

In this case the deputy found that claimants' unemployment was due to a stoppage of work which existed because of a labor dispute in the premises in which he was last employed. In affirming the deputy's finding and decision the Appeals Tribunal found that the employers through the Labor Relations Committee of the Association and the claimants through the representatives of their respective Unions were engaged in a controversy concerning the terms and conditions of employment of all of the claimants and found that this controversy constituted a labor dispute that caused the stoppages of work in each of the employer's premises in which the claimants were last employed and further found that the claimants' unemployment was due to such stoppages of work. The findings and decision of the Appeals Tribunal were affirmed by the Commission which held "that the findings of fact of the Appeals Tribunal are supported by competent and substantial evidence and that the decision of the Appeals Tribunal was made in accordance with the Law." Even the trial court conceded that "there was a stoppage of work which existed because of a labor dispute."

We think the finding of the deputy and the Appeals Tribunal that claimants' unemployment was due to a stoppage of work which existed because of a labor dispute in the premises is amply supported by substantial evidence in the record.

Claimants claim that the stoppage of work which existed because of a labor dispute must take place "in the factory, establishment or other premises in which he is or was last employed."

It is the contention of claimants that the mention of the specific locality and the specific thing at that locality that will cause a claimant to be ineligible for unemployment benefits impliedly includes all other localities and things. In this regard they contend that the Appeals Tribunal erroneously stated "so long as the stoppages of work resulted from a labor dispute it makes no difference whether the stoppages were brought on by the action of the employees in calling a strike, or as in these cases by the action of the employers in closing their service and parts departments and locking out their employees."

Claimants contend that the trial court was correct when it said, "This court takes a different view as to whether it makes

any difference if the work stoppage was caused by the employees, by virtue of a strike, or by virtue of the employers when they 'locked out' their employees."

An examination of these two statements indicates that the Appeals Tribunal and the trial judge were not discussing the same matter. As the Appeals Tribunal indicated the primary finding is that there was a labor dispute which caused the stoppage of work. The labor dispute was not, as the trial court found, the strike or the lock-out. The labor dispute was the controversy and disagreement which took place between the Association and both Unions jointly in which a new agreement concerning wages, hours and working conditions and a pension was being negotiated.

Frankly, the labor dispute was in existence before the strike and the lockout took place. A number of meetings, attempting to resolve the differences between the two Unions and the Association acting in behalf of the employers, had taken place for several months before the strike and the lockout. The strike and the lockout in the instant case were the tools by which District No. 9 and the employers sought to prevail in the dispute.

Claimants rely on the cases of Department of Industrial Relations v. Drummond, 30 Ala.App. 78, 1 So.2d 395, and Emrick v. Unemployment Compensation Commission, 3 Storey 561, 173 A.2d 743. We have no need to comment on the merit of the holdings in those two cases. It is only necessary to distinguish them from the case at bar.

In the Drummond case claimant was in no way interested or concerned with the negotiations, either personally or by organization affiliation, being carried on by the employer with the United Mine Workers of America. Claimant was not a member of that organization. He was not engaged in any disagreement or labor dispute of any character with his employer and his unemployment was due to a lockout by his employer who was afraid of violence when others, members of a union, were on strike. The factual situation in the Drummond case is not analogous to that of the instant case. It is interesting to note that in a dissenting opinion one of the judges in the Drummond case found that it was the labor dispute which directly caused claimant's unemployment.

In the Emrick case claimant, an employee of a subcontractor, was unemployed because the employees of another subcontractor went on strike with the result that claimant's subcontractor could do no more work until the strike was ended. The striking employees were members of a union entirely unconnected with claimant's union. Claimant's union was not on strike and had no dispute with the employer or anyone else. The court found that claimant did not have the slightest interest in the labor dispute that caused his unemployment and that claimant had nothing to gain or lose from the outcome of the dispute. Thus claimant was allowed compensation. Again, the facts in the Emrick case are far removed from those in the instant case.

■ Answering the other contention of claimants that the stoppage of work which exists because of a labor dispute must take place in each of the premises in which the claimant is or was last employed, the record clearly shows that each claimant was a member of Local 618 and had as his representative in the negotiations the officers of said Union and as a result each claimant was involved in the labor dispute and was involved in each of the premises of each employer who was a member of the Association. The employer of each claimant, similar to the claimant, was represented in the negotiations by a representative, namely, the Association, and its Labor Relations Committee. Claimants cannot be heard to say that they were not engaged in a labor dispute at the premises at which each was employed because no strike occurred there. Each and all claimants were members of Local 618 and each claimant knew that his representatives were engaged

in bargaining for a new agreement with the employers through their Association and that the bargaining concerned wages, hours, working conditions and a pension. Therefore, all claimants were involved in the labor dispute and each claimant's unemployment was due to a stoppage of work in the premises where he was employed caused by such labor dispute. We will point out later that in disputes between a multi-employer association and one or more Unions, particularly where they act jointly, composed of men employed in separate premises involves all of them as a group and, therefore, all of the employers' premises constituted a single premise or establishment.

The evidence before the Appeals Tribunal shows that every claimant, a member of Local 618, knew that the representatives of his Union were engaged in bargaining for a new contract with the Association and because of this was involved in the labor dispute and under this reasoning, which we think correct, claimant's unemployment was directly due to a stoppage of work in the premises where each claimant was employed.

Claimants contend that what we have said is opposed to our holding in the case of Kroger Company v. Industrial Commission of Missouri, etc., Mo.App., 314 S.W.2d 250. Here again, the facts in the Kroger case are not analogous to those of the instant case.

Kroger had a bakery and warehouse and a large number of stores in the metropolitan area of St. Louis. The employees were represented by various unions. As a result of the breakdown in negotiations over a new contract, a strike was called against Kroger by one of the Unions at the bakery and warehouse and pickets were placed at both places. Only one union declared a strike against the Kroger Company. It is unnecessary to detail more of the facts because what we have stated shows that there was only one union negotiating with the Kroger Company and that the claimants were not members of that union.

In the instant case both unions were negotiating for a new contract and claimants were members of one of the unions. In the Kroger case only one employer was involved and the claimants who were locked out by the Kroger Company were not involved in a labor dispute, whereas, in the instant case the claimants were involved in a labor dispute between both unions and the multiple employers. Therefore, as stated, the collective premises of the employers were the premises in which the labor dispute existed which caused the stoppage of work.

In the Kroger case the union involved in the labor dispute and which called the strike had member-employees only in the bakery and warehouse, whereas, as the facts in this case show, District No. 9 and Local 618 had member-employees in the premises of every employer represented by the Association. We think the aforesaid sufficiently distinguishes the Kroger case from the instant case.

Finally, despite the fact the deputy, the Appeals Tribunal and the Circuit Court found that a labor dispute existed, claimants contend that their action in continuing to work without interruption after the contract between them and their employers had been terminated is affirmative proof that no dispute existed between the claimants and their employers.

Claimants contend that their conduct is completely out of harmony with the contention that a labor dispute existed. They base this contention on the fact that they continued to work between June 1 and June 9, 1959, at the same wages and working conditions that were in effect under the contract that terminated June 1st, and from this they reason that no dispute had occurred between the employers and the claimants between those dates. After June 8th they contend the evidence shows that they were ready and willing to continue

their employment and that this demonstrates that no labor dispute existed.

They further contend that merely because their representatives jointly negotiated with the representatives of District No. 9 and the Labor Relations Committee of the Association, that this did not ipso facto produce a labor dispute. Of course, the immediate question that comes to mind is "What prevented an agreement between the representatives of claimants and the employers?" Obviously, it was the dispute shown by the record evidence which prevented an agreement between the representatives of Local 618 and the employers.

In the letter of March 27, 1959, signed jointly by the representatives of District No. 9 and Local 618, among the proposed changes applicable to Local 618 was the proposal that concerned pension trusts and provided that each employer shall contribute to the pension fund the sum of $4.00 a week for each employee who has been on the payroll thirty days or more. This proposal and others submitted by Local 618 obviously was not agreeable to the employers. The notice of April 20th, 1959, filed by the officers of both Unions with the Federal Mediation and Conciliation Service explicitly stated that "a dispute exists" with the employers. The letter of July 2nd read into the record by the attorney for Local 618 clearly stated that an impasse had been reached in collective bargaining between the Local and the Association and pointed out that the Local and the Association were unable to narrow the issues involved to an area within which it was reasonably hopeful for a final agreement and for this reason Local 618 suggested that a real deadlock had been reached and that further collective bargaining was hopeless.

In the letter of June 9, 1959, signed by the officers of Local 618 and addressed to all of the employers, while it contains a statement that pensions had never been a must with Local 618 to effect a settlement, there is no attempt to withdraw their demands for a pension in this letter. Rather, it clearly states that it was quite true at the last meeting that the Local 618 did include a pension request. This letter further demonstrates the existence of a disagreement between the employers and Local 618 when it specifically stated that the Local had resisted from the very first certain proposals offered by the Association.

Further, Mr. Hayward and Mr. Lester P. Francis testified that the negotiations concerned wages, working conditions and a pension plan and that the demands concerning a pension plan were made by the representatives of both District No. 9 and Local 618.

Further, as has been pointed out often, all of the meetings were held jointly and when a settlement of the labor dispute was reached between the parties a new contract between Local 618 and each employer provided for wage increases and a pension plan. When the claimants filed their claims for benefits, they gave a "labor dispute" as the reason for the separation from their employment. In the face of all of this evidence, it is difficult to understand the contention of claimants that there was no labor dispute. Their contention that all that took place were negotiations, fails to take into account the reason for these negotiations. Obviously, the reason was the differences that existed between the employers and Local 618, representing the claimants.

Chapter 288 RSMo 1959, V.A.M.S. the Employment Security Law, does not define a "labor dispute" but Chapter 295 RSMo 1959, V.A.M.S., relating to Labor Relations defines the term "labor dispute" as follows:

"The term 'labor dispute' shall involve any controversy between employer and employees as to hours, wages, and working conditions. The fact that employees have amicable relations with their employers shall not preclude the existence of a dispute among them concerning their representative for collective bargaining purposes." Sec. 295.020.

Further support for what we have said may be found in Bankston Creek Collieries v. Gordon, 399 Ill. 291, 77 N.E.2d 670; Appeals by Employees of Polson Lumber & Shingle Mills et al., 19 Wash.2d 467, 143 P. 2d 316; 81 C.J.S. Social Security and Public Welfare § 175, p. 263.

Finally, the claimants contend that the direct and proximate cause of their unemployment was not the strike that was conducted by District No. 9 at the seven establishments in which none of the claimants were last employed, but was the lockout that occurred at the very establishments in which claimants were last employed.

As we have pointed out earlier, the labor dispute in the instant case was neither the strike, nor the lockout, nor both, but the strike and the ultimate lockout were the result of the labor dispute.

In summation we agree with the Commission and the Appeals Tribunal that claimants are ineligible for unemployment benefits because their unemployment was due to a stoppage of work which existed because of a labor dispute in the premises in which each of them was last employed. This finding of the Appeals Tribunal is supported by substantial evidence.

However, this ineligibility of the claimants for benefits under the Employment Security Law can be removed if it is shown to the satisfaction of the deputy that claimants did not participate in, finance or were not directly interested in the labor dispute which caused the stoppage of work and if it is also shown to the satisfaction of the deputy that claimants did not belong to a grade or class of workers of which, immediately preceding the commencement of the stoppage, there were members employed at the premises at which the stoppages occurred, any of whom were participating in, financing or directly interested in the labor dispute.

It will be remembered that the Appeals Tribunal and the Commission found that the claimants both participated in and had a direct interest in the labor dispute. The Circuit Court found that the claimants did not participate in the labor dispute and were not directly interested in the work stoppage "even though they participated in the negotiations with the Association and benefited by the contracts that resulted."

■ The burden of proof to establish the right of the claimants to unemployment benefits under the Act rested upon the claimants and they were eligible for benefits only if the Commission found, through its affirmance of the Appeals Tribunal, from competent and substantial evidence, that the required conditions called for under § 288.-040, subd. 4 have been met and that claimants were qualified. Producers Produce Co. v. Industrial Commission, 365 Mo. 996, 291 S.W.2d 166, l. c. 173; Burak v. American Smelting and Refining Co., 134 Colo. 255, 302 P.2d 182; A. Borchman Sons v. Carpenter, 166 Neb. 322, 89 N.W.2d 123.

■ Therefore, it was the burden of claimants to show that they had not participated in or financed the labor dispute which caused the stoppage of work, and they had the further burden of showing that they were not directly interested in the labor dispute which caused the stoppage of work. If they had discharged their burden in this respect, they had an additional burden to show that they did not belong to a grade or class of workers of which, immediately preceding the stoppage of work, there were members employed at the premises at which the stoppage occurred, any of whom were participating in or financing, or directly interested in such dispute.

■ We have shown that the officers and business representatives of Local 618 had acted and negotiated jointly with District No. 9 in the labor dispute before and after the termination of the agreement June 1, 1959. We think there is substantial evidence showing that claimants participated in the labor dispute. While they did not do so individually and personally, they did participate through their chosen representa-

tives in Local 618. We think it constitutes participation within the meaning of the Act when claimants either personally or through their chosen representatives make demands concerning wages, working conditions and pensions and enter into negotiations with the employers for the purpose of enforcing their demands whether by means of a strike or otherwise. We think this is particularly true in the instant case wherein the representatives of claimants negotiated jointly with the representatives of District No. 9. Support for what we have said here will be shown in the cases, which we will discuss later, involving negotiations between multi-employers and two or more Unions jointly.

■ We need not discuss or rule the issue of whether claimants financed the labor dispute which caused the stoppage of work because we feel that they have failed to sustain their burden of showing, not only that they had not participated, but that they were not directly interested in the labor dispute which caused the stoppage of work.

■ A claimant is directly interested in the labor dispute when he stands to gain or lose by the outcome of the dispute. Many cases have held that a claimant is directly interested in the labor dispute when his wages, hours or working conditions will be affected by the outcome of the dispute. In the case of Nobes et al. v. Michigan Unemployment Compensation Commission et al., 313 Mich. 472, 21 N.W.2d 820, a union in the plant of claimants' employer made certain demands upon the employer which were refused. Thereupon, the Union called a strike and established a picket line. The claimants were not members of the Union and were opposed to recognition of the Union in the employer's establishment. The court found that there was a stoppage of work and a strike occurred because of a labor dispute growing out of the company's refusal to recognize the Union as sole bargaining agent for its own members and because of the company's refusal to accede to certain demands made by the Union. After finding that a labor dispute existed, the

court further found that the claimants were directly interested in the labor dispute which caused the stoppage of work. In so holding the court relied on a statement made in the case of Chrysler Corporation v. Smith, 297 Mich. 438, 298 N.W. 87, 135 A.L.R. 900, wherein the court said:

"that an employee is directly interested in a labor dispute if his wages, hours, or conditions of work will be affected by the outcome of the dispute. * * * The labor dispute involved new contract provisions in which claimants were directly interested, and the stoppage of work and the calling of a strike * * * were well calculated to bring about a new contract of employment of direct interest to all claimants." (21 N.W.2d l. c. 823.)

In the case of Burak v. American Smelting and Refining Co., supra, the court said:

"The prevailing rule is that an employee is 'directly interested' in a dispute, when his wages, hours or conditions of work will be affected favorably or adversely by the outcome of a strike. It is of no consequence that such employee is not a member of the union conducting the strike or that he may not be in sympathy with its purposes. (Citing cases.)

"We conclude that one whose job is classified in a Union contract and will gain or lose by reason of the success or failure of a labor dispute which culminates in a strike, is directly interested therein notwithstanding he may not be a member of the Union which called the strike." (302 P.2d l. c. 184.)

A case analogous to the instant case is that of A. Borchman Sons v. Carpenter, supra. The Nebraska Statute set out in the opinion of the court is almost identical with that of this state. The precise question for decision was, "has each of the claimants met his burden of proof so as to remove the disqualification of benefits under the act?" A number of general contractors had form-

ed an association for the purpose of representing all members in matters of common interest. This Association, similar to the one in the instant case, had the power of acting as bargaining representative for all of its members in labor contract matters. The labor unions were organized on a craft basis. Each union retained its bargaining power in labor matters so far as contracts were concerned with the exception of the Carpenters' Union. Several local unions of carpenters had a council representing them. However, as the opinion holds, all of the unions involved had a building trades council to aid each other to secure adequate working hours and just compensation. This council was composed of delegates from the various unions, on a membership representative basis, and was supported by dues paid by the constituent unions on a membership basis. The court in its opinion said: "It will then be seen that the contractors and the unions were each in a position to use their combined strength to enforce economic sanctions against the other." (89 N.W.2d 1. c. 126.)

Several weeks before the labor contracts with the several labor unions expired the contractors association and the building and construction trades council began negotiating on a matter of new contracts. The representatives of the unions were demanding wage increases in all instances and welfare increases in some or all instances. The Carpenters' Union authorized their representatives to call a strike and the Operating Engineers Union called a strike and put out picket lines on those jobs where the larger number of engineers were employed. One of the claimants was a member of a laborers union and was employed at a place where a picket line was established. He left the job and did not return for work. Other claimants who were members of the Carpenters' Union were employed at places where no picket lines had been established. It was stipulated that work on all jobs was suspended by the election of the contractors. It will be observed that the factual situation in the aforesaid case closely parallels the factual situation in the case under review. After pointing out that the burden was on the claimants to re-qualify themselves for benefits, the court said:

"Here we have a situation where all unions, including those to which claimants belong, have a common interest and purpose of securing increased wages and one union strikes and produces the unemployment that is the basis of the claims.

"Are the members of the unions that are not striking entitled to the benefits of the Act?" (89 N.W.2d 1. c. 127).

Pointing out that the statute requires claimants to show that they are not "directly interested in the labor dispute which caused the stoppage of work" the court quoted from Martineau v. Director of Division of Employment Security, 329 Mass. 44, 106 N.E.2d 420, 424, where the court said:

"'The statute, however, does not confine disqualification to those employees who participate in or finance the labor dispute. In addition, it withholds benefits from employees who are "directly interested in a labor dispute." * * * a person is "directly interested" in a dispute when his wages, hours, or conditions of work will be affected favorably or adversely by the outcome. It is of no consequence that the person is not a member of the union conducting the strike or that he may not be in sympathy with its purposes.'" (89 N. W.2d 1. c. 127.)

The court found that the claimants failed to meet their burden of proof and denied them compensation under the Act.

In the case of Henzel v. Cameron, heretofore cited, plaintiffs were employees of trucking firms operating in Oregon and were members of Teamsters Unions under the jurisdiction of Joint Council No. 37, which covered Oregon and some southern Washington Counties. The claimants were seeking unemployment benefits for a period

during which they were unemployed because of a lockout effected by their employers who were members of the Truck Operators' League of Oregon. Prior to 1958 negotiations between claimants employers and the Union were on a state-by-state basis. However, negotiations for the 1958 contract were attempted by the Western Conference of Teamsters on a multi-state basis and sought to effect a Master Agreement with employers of eleven western states represented by the Western Empire Operators' Association. After hearing "rumbles" that there was a possibility of a strike occurring in one of the areas in California by one of the locals due to disputes its members were having over the pick-up and delivery agreements, the employers negotiating committee sent a wire to the Unions in the eleven western states which declared the employers' policy that "a strike against one is a strike against all." Seven days later Joint Council 38 in California went on strike. The employers then closed down all operations. Throughout the lockout the claimants were ready and willing to work and needed no permission from their local unions to accept work, but for the lockout work would have been available to claimants to the same extent as prior to the lockout. The court, after stating that the finding of the claimants "direct interest" in the labor dispute was one of fact and not one of law, said: (365 P.2d 1. c. 503)

> "An examination of the record reveals that there is substantial evidence to support the commissioner's finding that the claimants were 'directly interested' in the labor dispute. The long line drivers' contract was definitely being negotiated on an eleven state basis which affected all of the claimants in that class. * * *"

It said further:

> "It is evident, therefore, that, since the contract consummated after the labor dispute differed from the agreement contemplated before the labor dispute, the hours, wages and working conditions of the claimants were at stake during this critical period.

> "An individual is deemed 'directly interested' in a labor dispute when his wages, hours or conditions of work will be affected favorably or adversely by the outcome." (Cases cited.) (365 P.2d 1. c. 504.)

The court then held that the finding of fact by the Commissioner that the claimants were "directly interested" in a labor dispute since it was supported by substantial evidence, is conclusive upon the reviewing court and held that there was substantial evidence to support the Commissioner's Finding that the claimants were directly interested in a labor dispute and, therefore, were disqualified from receiving unemployment compensation.

■ We are in agreement with what has been said in the aforesaid cases. It follows, therefore, that the opinion of the trial court that Local 618 was not "directly interested," even though the evidence shows that the union representing claimants participated in the joint negotiations for a new contract and that all of the claimants benefited by the new contract which gave to them increases in wages and a pension to both unions, is incorrect because we find that the finding of the Appeals Tribunal and the Commission that the claimants were directly interested in the labor dispute is supported by substantial and competent evidence in the record.

We are in agreement with the contention made by the Commission and the Employers that a reading of the record in this case brings one to the inescapable conclusion that every member of Local 618 was directly interested in the labor dispute which was in progress between Local 618 and District No. 9 and the Association acting for all of the employers.

■ It is beyond dispute that each member of Local 618 would be affected by the outcome of the labor dispute and stood

to gain or lose by changes in the contract being negotiated. As the cases hold and with which holdings we agree, this is sufficient to show that claimants who were members of Local 618 had a direct interest in the labor dispute.

Claimants and the Circuit Court in its decision rely on two cases: Wicklund v. Commissioner of Unemployment Compensation et al., 18 Wash.2d 206, 138 P.2d 876, 148 A.L.R. 1298, and Kieckhefer Container Co. v. Unemployment Compensation Commission et al., 125 N.J.L. 52, 13 A.2d 646.

The Wicklund case is distinguishable from the instant case. The membership of a Woodworkers Union attempted to compel all trainmen, who were members of another union, to take out membership in the Woodworkers Union. The membership of the Woodworkers Union decided that they would refuse to load logs on railroad cars brought to them by non-members of their union. The trainmen were, at all times, willing and anxious to continue working under the conditions existing when the woodworkers called a strike. Because the membership of the Woodworkers Union refused to load the cars, log production was suspended and as a result the trainmen were unemployed. The Supreme Court of Washington held that the trainmen were not disqualified for unemployment compensation because they were not directly interested in the labor dispute which caused the stoppage of work. A reading of the Wicklund case plainly shows that there was no joint action involved between the Woodworkers Union and the trainmen and further shows that the trainmen did not participate in any negotiations with their employer nor did they stand to benefit from the settlement of the dispute.

In the Wicklund case the court cited the Kieckhefer case. Again, without ruling on the merits of the Kieckhefer case, the facts can be distinguished from the instant case. In that case claimant was not a member of any labor union, did not attend any meetings of a labor union, did not contribute to a labor union, nor participate in the labor dispute. He was unemployed by reason of the stoppage of all work in the employer's plant due to a labor dispute. In this case, as in the Wicklund case, claimants were allowed benefits because they had no part in initiating or causing the labor dispute. Thus, the distinction between these cases and the instant case is readily seen. However, it should be noted that the Court of Appeals of Georgia in Huiet v. Boyd, 64 Ga.App. 564, 13 S.E.2d 863, differed with the opinion in the Kieckhefer case in its definition and application of the expression "directly interested." The court in the Huiet case said:

"The act provides that one 'participating' in the dispute is disqualified from the benefits. The expression 'directly interested' as used in the act, must necessarily, if given any meaning at all, have a meaning different from that of 'participating' in the dispute. This rule of the New Jersey court seems to be at variance with the general acceptance of the meaning of 'directly interested' in the labor dispute by various labor boards and other tribunals, cited above in this opinion."

The meaning given to the term "directly interested" in the Kieckhefer case is at variance with the cases we have cited.

Claimants have failed to show that they were not directly interested in the labor dispute and for this reason alone they are not entitled to benefits under the Act. However, as we have pointed out, there is another disqualification in that they have failed to show that they did not participate in the labor dispute.

Earlier in this opinion we said that we would discuss some of the cases wherein numerous employers would band together in a multi-employer unit for the purpose of collective bargaining with two or more unions acting jointly. It is true, as the Commission and the employers have pointed out, that such bargaining groups of employers and unions is a development that

may not have been foreseen by the Legislators who drew the Unemployment Compensation Act, nevertheless, we think the Act may be adapted to this modern development.

Where a union's strategy is to strike only some of the employers, members of a multi-employer association, and not all, such a process has been described as "whipsawing." This process was so described and discussed in the case of National Labor Relations Board v. Truck Drivers Local Union et al., 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676. In that case all of the employers locked out the employees as a defense to the Union's strike tactics. The Supreme Court of the United States found that such action by the non-struck members of the employers association did not constitute an unfair labor practice and, therefore, was lawful.

We have discussed the cases of A. Borchman Sons v. Carpenter, supra, and Henzel v. Cameron, supra, wherein multi-employer groups negotiated with multi-union groups and as additional support for what we have said, we cite the following cases, some of which we will discuss briefly: Depaoli v. Ernst, 73 Nev. 79, 309 P.2d 363; Operating Engineers, Local Union No. 3 of International Union of Operating Engineers v. Industrial Commission, 7 Utah 2d 48, 318 P.2d 336 (one employer and eleven unions involved in negotiations); Olof Nelson Const. Co. v. Industrial Commission, 121 Utah 525, 243 P.2d 951; Nelson v. Texas Employment Commission (Court of Civ.App. of Texas) 290 S.W.2d 708.

In the case of Olof Nelson Const. Co. v. Industrial Commission, supra, 75 general contractors were members of an Association. The 75 members employed in excess of 5000 employees who were members of one of 6 basic craft unions affiliated with the American Federation of Labor. Prior to the termination of the 1949–1951 contract the Secretary of the Building Trades Council representing the 6 craft unions, advised the Association by letter of the Union's desire to open the wage provisions of the contract and revise the wage rates upward. After a series of meetings which were unsuccessful in arriving at a new wage scale, the Association directed a letter to the Building Trades Council stating "that a strike against any individual contractor who is a signator (to the agreement) will be regarded as a strike against all." (243 P.2d l. c. 953.) The strike was called and pickets were assigned to two jobs conducted by two of the contractors, members of the Association. All of the members of the Association closed down their construction projects and laid the men off those jobs. None of the claimants in the case were employed by the two struck employers and all of the claimants had reported for work until the lockout. The court held that all of the claimants were involved in the dispute and, therefore, in the strike and that "they were involved wherever they were situated, including in their own plants or establishments; and are, therefore, ineligible for benefits." (243 P.2d l. c. 963.)

The final case for discussion is that of Depaoli v. Ernst, supra, and is one where, in principle, it is very similar to the instant case. In that case claimants were members of Local 533 of the International Brotherhood of Teamsters etc. This Local, together with other Union Locals, was negotiating a new contract with a multi-employer association of truckers in 11 western states. Two of the local unions in California called a strike against 3 employers in Nevada at their California terminals. However, as in the case at bar, Local 533 did not strike. Because of the called strike by the other unions, all of the employers closed down their operations. The Supreme Court of Nevada held that the unemployment of members of Local 533 as result of strike called by the other local unions in aid of joint negotiations between representatives of all such unions and employers association for industry wide contracts was due to a labor dispute within the meaning of the Unemployment Com-

pensation Act providing for disqualification of unemployment benefits with respect to unemployment due to a labor dispute which was in active progress at their respective places of employment. All of the claimants for the reasons given were disqualified from benefits under the Act.

The final contention urged by claimants is that the notices of termination that were mailed by the Association and the two Unions jointly extinguished all contractual relationships between all parties to the contract and restored the claimants and Local 618 to their original separate positions. They cite cases, which we need not discuss, to the effect that a rescission of a contract is to extinguish it as effectually as if it had never been made. The plain answer to this is that there was a termination of the contract by virtue of its own terms and there was no rescission of said contract. This contention of the claimants has no merit because, as we have demonstrated throughout this opinion, all of the bargaining that took place after the termination notices were given were joint insofar as Local 618 and District No. 9 were concerned and these joint negotiations continued until the very end when a settlement was consummated.

We rule that the findings of the Appeals Tribunal, affirmed by the Commission, were supported by substantial evidence, and said findings and decision affirmed by the Commission was authorized by law.

Because the factual situation as shown by the record in this case and the questions raised and involved were matters of first impression and have not been before the appellate courts of this state before, we have answered and discussed fully all of the points and contentions urged by the claimants and thus a lengthy opinion results.

The finding and judgment of the trial court is reversed and the findings and decision of the Appeals Tribunal and affirmed by the Commission is affirmed by this court.

JACK P. PRITCHARD and J. MORGAN DONELSON, Special Judges, concur.