Joe O'DELL, Harold D. Varner, Wilburt Purl, et al., Appellants,

v.

The DIVISION OF EMPLOYMENT SECURI-TY of the State of Missouri, the Industrial Commission of Missouri and the Members thereof, J. R. Rose, George W. Wise and Charles E. Cates, and General Motors Corporation, Respondents.

No. 50193.

Supreme Court of Missouri,

Division No. 1.

March 9, 1964.

**138**

Krings, Whipple, Mauer & Eisler, by C. David Whipple, Kansas City, for appellants.

Lloyd G. Poole, Jefferson City, counsel for respondents, Industrial Commission of Missouri and Members thereof.

Gordon P. Weir, Jefferson City, counsel for respondent, Division of Employment Security of State of Missouri.

John Murphy, of Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, for respondent, General Motors Corp.

HOUSER, Commissioner.

■ Nine hundred and forty-seven employees of General Motors, Chevrolet Division, Kansas City filed claims for unemployment compensation benefits. Without a hearing a deputy determined that claimants were eligible and that their unemployment was due to lack of work at the premises, not to a stoppage of work resulting from a labor dispute. After a hearing before a referee the Appeals Tribunal reversed the deputy's determination and denied all claims. The Industrial Commission, one member dissenting, denied an application for review, holding that the findings of fact of the tribunal were supported by competent and substantial evidence and that its decision was made in accordance with law. Claimants filed a petition for judicial review in the Circuit Court of Jackson County under § 288.210,[1] joining Division of Employment Security, Industrial Commission and its members, and General Motors Corporation, hereinafter "GM," as parties defendant. After reviewing the transcript and hearing oral arguments the circuit court affirmed the findings of the Industrial Commission and denied the claims for compensation. Following an unavailing motion for new trial plaintiffs appealed to this court. The aggregate amount in dispute totals $218,757, which vests appellate jurisdiction in this court. Flanigan v. City of Springfield, Mo.Sup., 360 S.W.2d 700.

In stating the facts we draw heavily, without the use of quotation marks, on the

1. Section references are to RSMo 1959, V.A.M.S., unless otherwise indicated.

referee's findings of fact, but have made deletions, rearranged the material, and added undisputed facts from the transcript where deemed appropriate.

GM operates 23 automobile assembly plants in the United States. Thirteen plants, located in Kansas City, St. Louis, and in New York, Georgia, Michigan, California, New Jersey, Maryland, Ohio, Wisconsin and Massachusetts, assemble Chevrolet automobiles or Chevrolets and Corvairs. All of them conduct a coordinated operation, identical or substantially identical to that in Kansas City, all under one roof, or substantially so. There are 6 assembly plants for Buick, Oldsmobile and Pontiac (BOP); 1 for Buick only; 1 for Oldsmobile only; 1 for Pontiac only, and 1 Cadillac assembly plant.

One of GM's Chevrolet and Corvair assembly plants is located in the 6800 block of East 37th Street in Kansas City, Missouri. It is a single building, covering an area as large as two or three square blocks, housing both the Fisher Body Division (2,000 hourly paid workers) and the Chevrolet Division (1,950 hourly paid workers) of the Kansas City plant, under one roof. Bodies are made by Fisher Body Division in the east portion; Chevrolet and Corvair passenger automobiles and Chevrolet trucks are assembled in the west portion of the building. Approximately 30 repairmen on the payroll of Fisher Body Division work in the Chevrolet portion of the plant on Chevrolet and Corvair passenger car assembly lines alongside Chevrolet Division workers, repairing body paint and trim, an operation essential to the completion of the automobiles as saleable products. A fire wall, constructed for safety purposes after a fire at GM's Lavonia plant in 1953, runs north and south in the building, dividing the two operations. The wall does not run the entire length of the building. On the second floor there is an open area approximately 80 feet wide between the end of the fire wall and the front wall of the building. This space permits free movement of conveyor lines

carrying Chevrolet and Corvair bodies from the Fisher body side to the Chevrolet side of the premises. Across the front of the building are offices where salaried workers of both divisions are employed. There is a cafeteria for use of all employees in the building. The equipment is owned by GM, leased to a private operating company. One power plant provides power for the entire building. A common lobby for the use of both divisions is located in the front of the building. The address of Chevrolet Division is 6801 East 37th Street; the address of Fisher Division is 6817 East 37th Street. Each division has its own manager, plant protection unit, personnel, accounting and payroll departments, employment office, first-aid and pre-employment facilities, located in each division's portion of the building. Each division has separate entrances to its area of the plant. On entering his plant area an employee is identified by a badge which is separate and distinct for each division. Fisher Division employees in the plant are paid by check drawn on Commerce Trust Company, showing it is the check of Fisher Body Division, General Motors Corporation, Kansas City Plant. Chevrolet Division employees in the plant are paid by check drawn on a different bank, showing it is the check of Chevrolet-Kansas City Division of General Motors Corporation. The plant is designed for the assembly of complete Chevrolet and Corvair passenger cars, ready to be sold and shipped to dealers for resale to the public. There are three conveyor lines on the Chevrolet Division side of the building, for the assembly of Chevrolet and Corvair passenger cars and Chevrolet trucks. The assembly of Chevrolet and Corvair bodies by Fisher workers, commenced on the assembly conveyor line on the Fisher side of the plant premises, continues on that line until the bulk of the Fisher work on the body is completed, then the conveyors take the bodies over to the Chevrolet side of the plant, through the opening between the end of the fire wall and the front of the building. The production

lines on both sides of the plant are open and obvious to everybody, and the way in which these bodies are placed on the lines and transported continually into the Chevrolet area is common knowledge, known to the officers of Local No. 93 and the members of the shop committees. Some distance inside the Chevrolet side of the building there is a cycling arrangement where the bodies are taken from the conveyor and either placed on a production assembly line or placed in a "body bank," which has a capacity of about 60 bodies. When placed on the line, other items are installed on the bodies by Chevrolet Division workers until the bodies reach the "body drop," where the body is dropped by a hoisting arrangement to the chassis line below and there attached to the chassis. From the body drop the conveyor line on which the body traveled from the Fisher side of the plant returns to the Fisher side, where the operation is started over again, and the entire process repeated. Production schedules of both divisions are 100% coordinated. Chevrolet has to have a body from Fisher for every passenger automobile chassis assembled on the Chevrolet side. Fisher constituted Chevrolet's only source of supply, except for a few sedan delivery bodies shipped in from a plant in Ohio, of which an average of 3 are used in an 8-hour shift. Fisher-Kansas City Division builds bodies only for Chevrolet Division-Kansas City, and the latter is the only user of the bodies there assembled. Fisher's work schedules are coordinated with the Chevrolet work schedules. Normally Fisher produces 40 bodies an hour and Chevrolet Division uses the same number. Except for the body bank, no provision is made for stockpiling bodies. The two divisions are closely coordinated as to work, number of shifts, reduction of forces on either side, close-downs for inventory, vacations or material shortages. If Fisher workers do not work, Chevrolet workers cannot work, and vice versa.

The International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, affiliated with the AFL-CIO, hereinafter "International Union," is the exclusive bargaining agent for all hourly production workers in GM's 23 plants. International Union and GM entered into a collective bargaining agreement October 2, 1958. All of the hourly paid workers working in the building, whether in the Fisher or Chevrolet Division, with a few exceptions, belong to the same International Union and to the same local (No. 93). The officers and trustees of the local are made up of both Fisher and Chevrolet Division workers. The employees of each division, however, constitute a separate bargaining unit, and each has its own bargaining committee. These committees are elected by the employees of the respective divisions. Each bargaining unit has its own local seniority and local wage agreement, subject to approval of International Union and GM. All general wage rates or pay increases are negotiated by GM's central office staff in Detroit and International Union. Employees transferred from one division to the other lose their seniority, except with respect to certain matters such as vacation pay.

A dispute arose regarding wages and working conditions of certain Fisher Body Division employees at Kansas City. Complaint was made about "too much work" and "excessive line speeds." In an effort to resolve the issues meetings, attended by the bargaining committee of the local Fisher Body Division employees, members of GM's local Fisher Body Division personnel staff, members of GM's industrial relations staff in Detroit and International Union's central office staff in Detroit, were held. The issues were not resolved. A strike vote was taken. Only local Fisher Body Division employees were eligible and only they took part in this vote. Chevrolet Division employees did not vote. The majority voted in favor of a strike. The strike was approved by International Union, and a strike was called at 9:51 a. m. on March 29, 1960. All local Fisher Body Division workers answered the strike call. The local Chevrolet Division employees were notified by the

union to remain on their jobs until they were laid off by management, then immediately apply for unemployment compensation. The strike brought to a standstill the production of bodies by the Fisher Body Division. The local Chevrolet Division employees continued to work until 11 a. m. on the day of the strike, one and a half hours after the Fisher Body workers struck, when the supply of bodies was exhausted. At that time approximately 1,300 Chevrolet Division workers were sent home. Approximately 620 workers on the truck line and about 30 maintenance workers continued to work throughout the strike. Fisher Body Division employees picketed the entrance to the Fisher Body Division operations. Chevrolet Division workers did not at any time perform any picket duty. During the strike, which continued from March 29, 1960 until settlement, ratification, and resumption of operations, which occurred on May 29, 1960, Fisher Body Division workers received financial assistance from International Union in the form of strike benefits as provided by the constitution depending on number of dependents, length of the strike, etc. Chevrolet Division workers out of work because of the strike received loans from International Union throughout the same period, figured on the same basis that strike benefits were paid. The financial assistance provided to the Fisher Body and Chevrolet Division members of Local No. 93 from the union's strike insurance fund amounted to a sum in excess of $400,000.

The National Agreement and the constitution of International Union were introduced in evidence.

While ordinarily it is the appellate function in a case of this type to decide whether the findings of the Commission are supported by competent and substantial evidence upon the whole record, § 288.210, and whether they were authorized by law, Art. 5, § 22, Missouri Constitution of 1945, V.A.M.S., the question on this appeal is solely one of law, because there was no conflict in the evidence on any material issue. Dubinsky Brothers, Inc. v. Industrial Commission of Mo., Mo.Sup., en banc, 373 S.W.2d 9, 16.

The law question involves the construction of certain language in paragraph 4 of § 288.040 of the Employment Security Law, Chapter 288, V.A.M.S., which follows:

"(1) A claimant shall be ineligible for waiting week credit or benefits for any week for which the deputy finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed; * * * and provided further, that if in any case separate branches of work which are commonly conducted as separate businesses at separate premises are conducted in separate departments of the same premises, each such department shall for the purpose of this subsection be deemed to be a separate factory, establishment or other premise; and provided further, that this subsection shall not apply if it is shown to the satisfaction of the deputy that

"(a) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(b) He does not belong to a grade or class of workers of which, immediately preceding the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute.

"(2) 'Stoppage of work' as used in this subsection means a substantial diminution of the activities, production or services at the establishment, plant, factory or premises of the employing unit."

The general purpose of Chapter 288 is to provide for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own. The Act

is to be liberally construed. § 288.020; ACF *Industries, Inc. v. Industrial Commission of Mo.*, Mo.Sup., en banc, 320 S.W.2d 484. Disqualifying provisions are to be narrowly construed. *Kroger Co. v. Industrial Commission of Mo.*, Mo.App., 314 S. W.2d 250. A liberal construction must be a fair and reasonable construction. The words and terms of Chapter 288 are to be used and construed in their plain, ordinary sense. *ACF Industries, Inc. v. Industrial Commission of Mo., supra.*

■ Section 288.040, subd. 4(1), which withdraws the benefits of the Act from those whose unemployment is due to a stoppage of work existing because of a labor dispute in the factory, establishment or other premises in which he is last employed, constitutes a legislative affirmation of the public policy that the state shall preserve a neutral position in labor disputes; a legislative recognition of the essential injustice of forcing an employer to assist in the financing of employees with whom the employer is engaged in a labor dispute, by requiring the payment of unemployment compensation benefits during a work stoppage. In re Ferrara's Claim, 10 N.Y.2d 1, 217 N.Y.S.2d 11, 176 N.E.2d 43. "[I]t would be unfair to use funds built up by labor and management jointly to support labor in a contest wherein it was exerting economic pressure against management by striking." *Olof Nelson Const. Co. v. Industrial Commission*, (1952) 121 Utah 525, 243 P.2d 951, 960. Our construction must not thwart the provision that the benefits are to be withdrawn in case of (1) a stoppage of work (2) existing because of a labor dispute (3) in the factory, establishment or other premises in which the claimant was last employed. The disqualifying provision, however, does not apply if the "separate branches of work" proviso is applicable, or if claimant shows that clauses (a) and (b) apply to him.

■ The burden of proof of the right of claimants to unemployment benefits under the Act, *Producers Produce Co. v. Industrial Commission of Mo.*, 365 Mo. 996, 291 S.W.2d 166, 173, and under clauses (a) and (b), *Poggemoeller v. Industrial Commission of Mo.*, Mo.App., 371 S.W.2d 488, 504, [10, 11], is on the claimants.

Specifically, the first question on this appeal is whether the Chevrolet Division of GM at Kansas City, where claimants were last employed, is a separate "factory, establishment or other premises" from the Fisher Body Division of GM at Kansas City. If so, the nonstriking claimants' unemployment was not due to a stoppage of work existing because of a labor dispute in the factory in which they were last employed, and they would not be ineligible under the first clause of § 288.040, subd. 4(1). But if claimants were employed in the *same factory* in which the striking employees of Fisher Body Division of GM at Kansas City were employed, they would be ineligible thereunder.

■ Our conclusion is that the words "factory, establishment or other premises" signify the place, location or situs of the claimant's employment, *Kroger Co. v. Industrial Commission of Mo.*, Mo.App., 314 S.W.2d 250, 254 [3], and in the case of factories such as GM's Kansas City plant do not refer to lesser units than factory-wide units of employment.[2]

In determining that the separate functions of the Chevrolet and Fisher Body Divisions constitute a single factory, and not separate factories, we have applied the tests of functional integrality, physical proximity and general unity. Anno: Unemployment Benefits—Labor Disputes, 28 A.L.R.2d 287, §§ 15, 16, 17, beginning p. 324; *Adamski v. State Bureau of Unemployment Comp.*, (1959) 108 Ohio App. 198, 161 N.E.2d 907; *Snook v. International Harvester Co.*, Ky.App., 276 S.W.2d 658; *Claim of Lasher*, 279 App.Div. 505, 111 N.Y.S.2d 356; *Mountain States Tel. & Tel. Co. v. Sakrison*, 71 Ariz. 219, 225

·2. Except where the "separate branches of work" proviso applies.

P.2d 707; Ford Motor Co. v. Abercrombie, 207 Ga. 464, 62 S.E.2d 209.

The test of functional integrality is fully satisfied. The assembly plant of GM at Kansas City is a highly integrated, coordinated factory, employing a continuous-flow assembly line, turning out a finished product which results from the joint effort of both divisions, Chevrolet and Fisher Body. The two divisions are absolutely interdependent. The operation of the Chevrolet Division assembly line depends upon the production of bodies produced by Fisher Body Division. These bodies are produced solely for use on that assembly line and no other, and are not sold to other manufacturers or to the public. Conversely, the operation of Fisher Body Division depends upon the provision of chassis assembled by Chevrolet Division, ready to receive bodies made by Fisher Body employees. The chassis assembly division could not continue functioning without the product of the body division; it has no other source of supply. The two units are jointly and simultaneously *engaged in the production of automobiles*, not only of chassis and bodies. They both operate assembly lines that are correlated and synchronized, at the ends of which the completed product, ready for market, emerges. After the assembly lines of the two units merge and join chassis and body at the body drop, employees of both divisions work side by side on the production line, collaborating in the common effort. Working together they produce a complete, finished, saleable product. The over-all operation is a highly intermeshed, integrated, moving continuously flowing progression.

As far as physical proximity is concerned, we have found no instance of a closer identity than that demonstrated by the two divisions of this automobile factory, which are located at the same place, in the same building, within the same walls, on the same floors, under the same roof. Heat is supplied both divisions by the same heating system. Water is supplied both from a common water tower. A single traffic department serves both divisions. They share a joint lobby, joint cafeteria service, joint parking lots. Physically, the operation is one unit.

The fact that a fire wall partially separates the two divisions is not significant, because it was built for safety purposes, not to effect a physical separation. The fact that the hourly rated employees of the two divisions have separate entrances or that the two divisions in the same building have different street numbers do not make these divisions separate factories.

There is a general unity of concept, plan and execution at the GM factory in Kansas City. It is organized for the assembly of passenger automobiles and trucks. For greater organizational efficiency there are two divisions, each with its own plant manager, personnel staffs, accounting departments, employment offices, pre-employment examination facilities, first-aid departments, and plant protection units. The management in each division, however, administers, the identical company policies and personnel and employment practices, which are promulgated by the higher officials of the company in Detroit. All employees at the GM factory in Kansas City, both in the Chevrolet and Fisher Body divisions, are employed by the same employer, GM, a single employing unit. While different clerks prepare the payrolls under the divisional method of organization, all employees of both divisions are paid by the sole employer, GM. Section 288.100, subd. 1(1) provides that "The division [of employment security] shall maintain a separate account for each employer, and shall credit his account with all contributions which he has paid." Nothing in the record indicates that in the administration of Chapter 288 GM is treated other than as a single employer with but one account. The suggestion that the two divisions are to be considered as separate factories because they produce different products fails because they jointly produce the same product—automobiles—and not chassis and bodies, as separate entities. There is complete unity on both local and

international levels in the union affiliation of the employees of the two divisions.

Claimants argue that these are two separate factories because each division has its own bargaining unit and shop committee which handle local grievances and may enter into local agreements concerning wages, seniority and working conditions; that the labor dispute in question was between the Fisher Body plant shop committee and the Fisher Body management; that Fisher Body employees only, and not claimants, voted on the strike, and that the settlement had nothing to do with the operation in the Chevrolet Division. All of the hourly rated employees at the GM factory in Kansas City, whether Chevrolet or Fisher Body employees, belong to the same international union, and to the same local union (No. 93) of the International Union. All of them are subject to the National Agreement between GM and UAW-AFL-CIO. That union is the certified and recognized exclusive bargaining representative of all of the hourly rated production and maintenance employees of GM at the Kansas City factory. The fact that Fisher Body Division employees have their own shop committee, made up of Fisher Body employees, which handle local grievances and may enter into local agreements concerning wages, seniority and working conditions (subject to approval by the International Union) does not militate against the obvious and impelling fact that the Fisher Body and Chevrolet Division employees were engaged in a common business or enterprise in the same factory, and not in separate factories. There is nothing in the Act which supports the conclusion that in a factory in which there are two divisions of employees represented by different bargaining units and having different shop committees the two divisions constitute different factories. Snook v. International Harvester Co., supra, 276 S.W.2d, l. c. 661, [2].

Claimants cite Kroger Co. v. Industrial Commission of Mo., Mo.App., 314 S.W.2d 250; Ford Motor Co. v. Unemployment Compensation Comm., 191 Va. 812, 63 S.

E.2d 28; Park v. Employment Security Comm., 355 Mich. 103, 94 N.W.2d 407; Nordling v. Ford Motor Co., 231 Minn. 68, 42 N.W.2d 576, 28 A.L.R.2d 272, and Koll v. Egekvist Bakeries, Inc., 259 Minn. 287, 107 N.W.2d 373, all of which are distinguishable on the facts. The Kroger Company case is not analogous for there was no such "interdependence" between and among the 52 retail store outlets and the bakery and warehouse where the strike occurred "as to constitute any one store an integral part of one 'establishment' in the sense of the statute or that would justify the application of the theory of 'functional integrality.'" In the Virginia and Minnesota Ford Motor cases and in the Park case the physical proximity factor was totally lacking. In the first two cases the unemployed nonstriking workers were employed in the assembly plants at Norfolk, Virginia, and St. Paul, Minnesota, respectively, but the strikes occurred in the parts department at Dearborn, Michigan. In the Park case claimants were employed in three plants in Michigan in the vicinity of Detroit, but the plant where the strike occurred was located at Canton, Ohio. Although Park repudiated "integral functioning" as a basic test of "establishment" it is interesting that the Michigan legislature last year restored functional integration as the test, § 17.531, Michigan Statutes Annotated, as amended by Act 226, Public Acts of 1963, § 29(1) (b), thus in effect reinstating the ruling on that point in Chrysler Corporation v. Smith, 297 Mich. 438, 298 N.W. 87, 135 A.L.R. 900. Koll v. Egekvist Bakeries, Inc., supra, is not in point because there the two groups of workers were employed by two separate and distinct employers, the two establishments were entirely independent of each other, and in all important physical respects the two operations were separate and distinct.

In the great bulk of the cases on this general subject the two plants, one of which makes component parts and the other of which assembles the parts into a finished product, will be found physically separated

by considerable distances—always by many miles, sometimes separated by state lines. Even in cases of wide separation of units many courts have found them to constitute a single "establishment," where there is a high degree of functional integration. In the only two cases we have found where the two units were located at the same place and there was functional integrality, compensation was denied on the ground that the strikers and nonstrikers were working in the same establishment. In Snook v. International Harvester Co., Ky.App., 276 S. W.2d 658, the company operated a machine shop for the assembly of farm equipment. The company erected, in close proximity and within the same fenced enclosure, a separate building known as the foundry, to produce castings for use in the assembly of tractors in the adjacent machine shop. Appellants were employed in the foundry. A strike occurred in the machine shop, as a result of which appellants were "laid off." Denied compensation below, appellants took the position on appeal that considering the situation from the standpoint of employment alone, the foundry and machine shop were separate because of the difference in the type of work done, the terms of employment, different immediate supervisors, and that the employees in the two buildings belonged to different unions. It was held that the machine shop and foundry could not be considered separate establishments; that they were functionally integrated; that there was a general unity both in the operation of the plant and in the nature of their employment, and that their physical proximity was such as to constitute a single unit; that the plant itself, composing both departments, was "a distinct physical place of business" and that the strike in the machine shop was in active progress in the establishment in which claimants were employed.

In Claim of Lasher, (1952) 279 App.Div. 505, 111 N.Y.S.2d 356, under a similar statute, Bethlehem Steel Corporation maintained a plant at Lackawanna, New York, where it manufactured steel, and employed a number of steelworkers who were members of the steelworkers' union. It also engaged there in construction work and erection of the finished steel product through a branch known as the Fabricated Steel Construction Division, Erection Department, employing a number of workers who were members of an ironworkers' union. The steelworkers went on strike, and after a shortage of steel developed the ironworkers were notified that there was no work for them. They filed claims for unemployment compensation, which were denied on the ground that they "were employed by the same employer as the striking steel workers, and were employed at the same plant and upon the identical premises. The work which they were performing was as essential to the production of steel at the plant as the work of the steel workers. * * * [T]hey were clearly employed in the 'establishment' where the industrial controversy arose. To hold otherwise would be tantamount to a holding that employees regularly working at the same plant but in a different department, or doing a different kind of work, or belonging to a different union than striking employees, would not be employed in the same 'establishment.' Clearly this was not the intent of the statute. * * * The undisputed evidence establishes that the industrial controversy occurred 'in the establishment' where claimants were employed."

We have concluded that the building, place, location and premises where the Chevrolet Division employees and the Fisher Body Division employees were working was a single automobile factory, and that the factory where claimants were employed was the *same* factory in which the work stoppage arising out of a labor dispute occurred.

The proviso of § 288.040, subd. 4(1) that a department shall be deemed a separate factory where separate branches of work which are commonly conducted as separate businesses at separate premises are conducted in separate departments of the same

premises has no application for the reason that under this record the only evidence on this issue is that the so-called "separate" branch of work (the manufacture and assembly of automobile bodies) is not commonly conducted as a separate business at separate premises. The evidence in this transcript shows that in all thirteen of the Chevrolet or Chevrolet-Corvair plants of GM, and in all six of its Buick, Oldsmobile, Pontiac plants, the bodies are manufactured and assembled in one plant. The only instances in which bodies are manufactured in a separate plant are in the case of trucks, and in making Cadillac, Buick, Oldsmobile and Pontiac automobiles in the Detroit area. The work of assembling Fisher bodies, therefore, on this record is not "commonly conducted" at "separate premises," nor is it conducted as a "separate business." Bodies are manufactured by GM as an integral part of its own business. It does not buy bodies from other manufacturers. It makes its own Chevrolet and Corvair bodies in its own plants, immediately adjacent to the assembly lines which join with the chassis assembly lines to produce a complete automobile. The only conclusion to be drawn from the evidence is that the two divisions in the Kansas City plant are not separate branches of work which are commonly conducted as separate businesses at separate premises, but are integrated branches of work which are commonly conducted as one business at the same premises.

■■■■ Claimants having been idled by a labor dispute within the meaning of the section were ineligible for unemployment compensation benefits unless subparagraph (1) is inapplicable by reason of clauses (a) and (b). No worker unemployed because of a strike arising out of a labor dispute under the section can recover benefits unless he proves that he is not participating in the labor dispute, is not financing it, is not directly interested in it, and that he is not of the same grade or class of workers as the strikers. Although the evidence shows that claimants did not vote for the strike, go out on strike, or picket, there was no showing that they did not participate in the labor dispute, in other ways, and they failed to prove that they were not financing the strike, and that they were not directly interested in it and that they were not of the same class of workers as the strikers. These limitations on the right to benefits must be given effect, and having failed to sustain the burden of proof with respect thereto, claimants are ineligible for unemployment compensation. Section 288.040, subd. 4(1) (a) (b); Producers Produce Co. v. Industrial Commission of Mo., supra; Poggemoeller v. Industrial Commission of Mo., Mo.App., 371 S.W.2d 488, 504. Not only did claimants fail to sustain the burden of proof that the disqualifications were inapplicable to them, but the undisputed evidence affirmatively shows that they belonged to the same class of workers as the strikers. Regardless of the differences in the nature of their individual duties, claimants and the strikers were all maintenance and production workers in the automobile manufacturing business of their employer, doing essentially the same type of work, i. e., the production work of assembling complete automobiles, in a highly integrated operation, and as such belonged to the same class. Dravo Corp. v. Unemployment Compensation Board of Review, 187 Pa.Super. 246, 144 A.2d 670; Unemployment Compensation Commission v. Martin, 228 N.C. 277, 45 S.E.2d 385.

Judgment affirmed.

COIL and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.