The PULITZER PUBLISHING COMPANY, Plaintiff-Respondent,

v.

LABOR AND INDUSTRIAL RELATIONS COMMISSION of Missouri, Division of Employment Security et al., Defendants-Appellants.

No. 61692.

Supreme Court of Missouri, En Banc.

March 11, 1980.

Rehearing Denied March 11, 1980.

James K. Cook, Cary W. Hammond, St. Louis, Rick V. Morris, Kevin M. Hare, Jefferson City, Morris J. Levin, Lewis E. Mallott, St. Louis, Gary H. Lange, Clayton, for defendants-appellants.

Robert B. Hoemeke, St. Louis, for plaintiff-respondent.

Jess W. Ullom, Clayton, for amicus curiae.

SEILER, Judge.

This is an appeal from a decision of the Circuit Court of the City of St. Louis which reversed the decision of the Labor and Industrial Relations Commission upholding the eligibility of the members of ten non-striking unions to unemployment compensation. The Labor and Industrial Relations Commission, the Division of Employment Security and individual claimants belonging to the ten non-striking unions appealed. We sustained the defendants' application to transfer after an opinion in the court of appeals because of the general interest and importance of the questions presented. We will treat the case as though here on original appeal. Mo.Const. art. V, § 10.

## I

The facts as found by the referee and adopted by the Labor and Industrial Relations Commission (hereinafter referred to as "the commission") are as follows: re-

spondent, The Pulitzer Publishing Company (hereinafter referred to as "the employer") publishes and prints a daily newspaper with plants and facilities at three different locations in St. Louis. The employer also does the printing for the other St. Louis daily newspaper. The employer's newspaper is distributed by carriers who are independent businessmen and not employees of the employer. The employer employs between 2,000 and 2,100 individuals. Between 50 and 100 of these employees are executive and administrative personnel who are not members of any union. About 32 of the remaining employees, less than 2% of all employees, are members of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, Local No. 610 (hereinafter referred to as "Teamsters"). The Teamsters performed duties at the docks and loading platforms adjacent to the production plants of the employer, loading and unloading newspapers and newspaper supplements, and were known as "dockmen".

The remaining employees, including the claimants, are members of some ten different skilled and highly skilled trade or craft unions. The services performed by these employees include those of reporters, photographers, photofinishers, photoengravers, lithographers, typesetters, printers, pressmen, mailers, paper handlers, stockmen, operating engineers, switchboard operators, bookkeepers, accountants, machinists, electricians, and maintenance men.

None of the claimants herein belonged the Teamsters, the striking union, nor did any of the claimants or other members of the non-striking unions perform any of the duties performed by the Teamsters. Likewise, none of the Teamsters perform any of the duties performed by the members of the non-striking unions to which the claimants belonged.

Each of the non-striking unions had existing collective bargaining agreements at the time the Teamsters went out on strike. Each of the non-striking unions negotiated their respective collective bargaining agreements with the employer separately from one another and separately from the Teamsters.

The collective bargaining agreement between the employer and the Teamsters expired at midnight, August 21, 1973. Negotiations for a new contract which had begun in early July, were unsuccessful and the Teamsters called a strike at the expiration of the contract. The Teamsters' pickets appeared shortly after midnight on August 21st at all three St. Louis plants. After the teamsters' strike began, the employer suspended operations in the publishing of both its own and the other major St. Louis daily newspaper.

There was no attempt by anyone on behalf of the employer to contact any of the officers or members of the non-striking unions to learn if they would instruct their members not to cross the picket line of the Teamsters if it appeared. Claimants and other members of the non-striking unions did in fact cross the picket lines and were refused work by the employer. Copies of the following letter were distributed to the claimants and other members of the non-striking unions when they crossed the picket lines of the Teamsters and attempted to report for work:

"Because of the action taken by Local 610, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, it has become impossible to publish, print and distribute the Post-Dispatch.

"In consequence of this we are compelled to notify you that there is no work available for you to perform and that, until further notice you are no longer required to report for work and your renumeration has ceased with the completion of your last shift worked.

"This should in no sense be considered as notice of termination of your emplyment relationship with us, but should only by considered as notice of a period during which there is no work to be performed.

"A limited number of employes needed to maintain the property will be notified individually regarding their assignments.

"When normal operations can be resumed and there is once again work for you to perform you will be notified.

"We want you to know that we repeatedly offered to arbitrate or mediate the issues in dispute with the striking union and the offer was rejected. We did everything possible to avert the strike and regret exceedingly that this situation has been forced on us affecting as it does so many loyal and faithful employes.

St. Louis Post-Dispatch"

Only one (Local 47) of the ten non-striking unions notified its members that it would sanction the Teamsters' picket lines. This sanction was in accord with the union's contract with the employer and was intended to prevent the employer from disciplining members of the non-striking union who might choose to refuse to cross the picket lines of the striking union. As noted above, despite this sanction, members of this non-striking union did in fact cross the Teamsters' picket lines. The union president testified that the members of the union were in fact urged to cross the picket lines and perform any and all available work. Later, when the employer learned that members of Local 47 were crossing the picket lines and reporting for work, the employer did not reconsider its decision to shut down its business.

Negotiations between the Teamsters and the employer continued and a settlement of the strike was reached on October 3, 1973. During the strike no newspapers were printed. Some members of the non-striking unions were able to continue working for the employer in such areas as payroll and maintenance during the strike. None of the claimants or their unions participated in the Teamsters' picketing nor made any financial contribution to the Teamsters during the strike. None of the claimants or their unions participated in the negotiations between the Teamsters and the employer,

nor was there any indication that any of the non-striking unions had authorized the Teamsters to negotiate any issues with the employer on their behalf.

The ten non-striking unions in their prior negotiations with the employer had dropped or withdrawn issues from their contracts concerning a fifth week of vacation for employees with seniority. The employer nonetheless, unsolicited, informed the unions, orally in most instances and in writing to others, that if any union successfully negotiated an agreement in relation to a fifth week of vacation, each of the other unions would receive the same benefits. One of the issues that remained unresolved at the time of the Teamsters' strike was the Teamsters' demand for a fifth week of vacation for employees with ten years' seniority. The issue was dropped during subsequent negotiations and the final settlement did not grant a fifth week of vacation to any of the Teamsters. Representatives of the various unions to which the claimants belonged testified that their respective unions had not agreed to the employer's offer concerning the issue of a fifth week of vacation.

The referee found, after a hearing which lasted five days, that the claimants were unemployed due to a stoppage of work which existed at the premises where they were last employed. The stoppage of work was caused by a labor dispute between the employer and the dockmen who were Teamsters. The claimants were not of the "same grade or, class" as the members of the union engaged in the labor dispute. The claimants and members of the unions to which they belonged did not have a "direct interest" in the labor dispute, nor did they participate in or finance the dispute. The claimants were, therefore, not ineligible for benefits under the provisions of § 288.040, RSMo 1978.[1] The commission affirmed the

---

1. Section 288.040.5, RSMo 1978, provides in part:

    (1) A claimant shall be ineligible for waiting week credit or benefits for any week for which the deputy finds that his total or partial unemployment is due to a stoppage of

work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed; . . provided further, that this subsection shall not apply if it is shown to the satisfaction of the deputy that

findings and decision of the appeals referee. The circuit court, however, reversed the commission's order on the grounds that the order was unsupported by the evidence and not in accordance with the law.

## II

The order of the commission is subject to review by the courts to determine whether it is "authorized by law" and whether it is "supported by competent and substantial evidence upon the whole record". Mo.Const. art. V, § 18. In reviewing an administrative decision, the circuit court's inquiry is limited. *Board of Education, Mt. Vernon Schools v. Shank*, 542 S.W.2d 779, 781 (Mo. banc 1976). The court may not substitute its judgment on the evidence and may not set aside an administrative decision unless the decision is clearly contrary to the overwhelming weight of the evidence. *Id.* at 782. "The court must consider the evidence in the light most favorable to the findings and decision of the commission, and all reasonable inferences therefrom, and must disregard all opposing and unfavorable evidence." *Neeley v. Industrial Commission*, 379 S.W.2d 201, 204 (Mo.App.1964). "If evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Board of Education, Mt. Vernon Schools, supra*, 542 S.W.2d at 782.

The legislature enacted the Employment Security Law in 1951 with the expressed purpose of setting aside unemployment reserves "to be used for the benefit of persons unemployed through no fault of their own." § 288.020.1, RSMo 1978. "This law shall be liberally construed to accomplish its purpose to promote employment security . . .

by providing for the payment of compensation to individuals in respect to their unemployment." Section 288.020.2, RSMo 1978. "Disqualifying provisions are to be narrowly construed." *O'Dell v. Division of Employment Security*, 376 S.W.2d 137, 142 (Mo. 1964).

## III

We find that the commission's findings and decision were supported by competent and substantial evidence and were not clearly against the overwhelming weight of the evidence.

### A

The commission found that the claimants and other members of the non-striking unions were not "directly interested" in the labor dispute. "[W]hether or not claimants were directly interested in a labor dispute which caused the stoppages of work are questions of fact requiring findings that could only be obtained from the evidence and could only be reached by natural reasoning." *Poggemoeller v. Industrial Commission*, 371 S.W.2d 488, 499 (Mo.App.1963).

The commission found that each union was independent of the others, having separate employment agreements with separate effective and termination dates, separate wages, hours and other conditions of employment. Each of the non-striking unions were working under binding collective bargaining agreements with the employer. None of the non-striking unions participated in the Teamsters' negotiations with the employer, nor did they authorize the Teamsters to negotiate on their behalf. All of the non-striking employees who were working when the strike was called continued to work through their respective shifts. The claimants and other members of the non-striking unions reported for work the

---

(a) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work, and

(b) He does not belong to a grade or class of workers of which, immediately preceding the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are

participating in or financing or directly interested in the dispute;

(2) "Stoppage of work" as used in this subsection means a substantial diminution of the activities, production or services at the establishment, plant, factory or premises of the employing unit.

next day and were denied work by the employer after they had crossed the Teamsters' picket line. None of the members of the ten non-striking unions participated in the picketing nor financially supported the Teamsters' strike efforts.

The employer contends that its promise to give all employees with ten years seniority a fifth week of vacation if it gave such benefits to the handful of Teamsters, effectively created a "direct interest" in the labor dispute for the non-striking employees under the *Poggemoeller* case, *supra*. In *Poggemoeller*, the court upheld the commission's finding of fact that the members of one union were "directly interested" in a labor dispute because they stood to gain or lose by the outcome of the strike of another union. The facts in *Poggemoeller* are starkly different from those in the case at bar. In *Poggemoeller*, the claimants were members of one of two unions whose members worked in various automobile dealerships and body shops. The claimants worked as service and parts personnel and the members of the other union worked as mechanics and repair workers. All of the various employers belonged to an association that was authorized to conduct negotiations with both unions. Although the employment agreements were executed by each employer separately, they were signed and executed by both unions jointly. Many of the provisions of these employment contracts applied equally to all employees regardless of which union they belonged to. All contracts in the past had been negotiated jointly by the two unions and contained identical execution and termination dates. Both unions jointly served notice on the employers that they wished to negotiate a new agreement. At the time when the mechanics union went out on strike, neither union was working under contract. The association continued to negotiate jointly with both unions throughout the strike and both unions were represented at all negotiations.

In the case at bar, the employer negotiated with each union separately. Each of the contracts of the non-striking unions varied materially from that of the dockmen's with respect to wages, hours and working conditions. The contracts did not have uniform execution or termination dates. At no time did the non-striking unions or their members participate in the negotiations between the employer and the Teamsters, or attend any of the negotiating sessions. There also was the following testimony from some of the non-striking union representatives: that they had no recollection of any assurances that in the event a striking union obtained a fifth week of vacation that the same would be offered to them; that they recalled no reports from the Teamsters that this subject was being negotiated; and that if there were to be any additional vacation time, each union would do its own negotiating on it and anything else would be null and void.

To be disqualified under § 288.040.5(1)(a), the claimant must be "directly interested" in the labor dispute causing the work stoppage. The adverb "directly" can be used in a variety of ways. It can have reference to time, as "directly after this he was removed"; or straightforwardness, as "he asked her opinion directly"; or direction, as "wind blowing directly offshore", but in the statute before us it is used in its causative sense of happening without anything intervening, as opposed to indirectly. In that sense the claimants here were interested only indirectly, not directly, in the vacation issue. There was evidence from which the commission could find that discussion of the vacation issue between the employer and the Teamsters (and it did not get beyond that stage) at the most could affect claimants only at some undermined future time and then only if additional vacation benefits materialized as a part of different collective bargaining agreements. The commission could have considered that any direct benefit to claimants from the vacation issue was speculative and the commission was within the evidence before it when it found that the claimants were not interested.

The commission found that the vacation issue (the only conceivable item in the dispute that could possibly benefit any em-

ployees other than the striking Teamsters) was not a principal issue in dispute between the Teamsters and the employer when the strike began. The major issue of the strike concerned the employer's attempted replacement of some of the Teamsters' manual labor through partial automation of the loading docks. There was no evidence that the vacation issue was an item seriously considered or negotiated by either the Teamsters or the employer.[2] It is not unusual in labor negotiations for each side to commence with a "laundry list" of demands, many of which are merely chips to be expended in the bargaining process.

There is another consideration. If an unsolicited conditional promise by the employer to give all employees whatever benefit the striking union obtained in regard to a single issue chosen by the employer were found per se to create a "direct interest" in the dispute for all employees, the legislative plan embodied in the statute would be altered. As noted above, one of the statute's basic purposes is to protect employees out of work through no fault of their own. If an employer's unsolicited conditional promise, no matter how remote the employer's obligation on it or how small a part it played in the negotiations, were to make all non-striking employees ineligible for protection under the statute, then the non-striking employees, out of work through no fault of their own, would become hostages in labor disputes. An employer would be able to exert extreme pressure on striking employees by making their strike most damaging to the non-striking employees. The non-striking employees, hit harder than the real parties to the dispute because they are ineligible for both unemployment benefits and their own unions' strike benefits, could

then be expected to pressure the striking union to give up its demands. The employer's promise could be made for this purpose with no intention to be bound by it, as the employer controls the condition precedent to his obligation to perform on the promise. It is not necessary to declare that such was the employer's intention here. The point is that it could be done. Moreover, an employer could also use such a conditional promise in this manner to escape its statutory financial responsibility toward its employees who are out of work through no fault of their own. The promise would make the innocent employees ineligible for the benefits and would thereby relieve the employer of the financial contribution for the benefits the statute would otherwise require. Given these potential subversions of the statutory purpose, together with the fact that no fifth week of vacation was actually granted the Teamsters and that what would have taken place with the other unions is speculative, the commission could reasonably find, based upon its expertise and experience in the area of labor negotiations, that the unsolicited conditional promise by the employer did not create the requisite "direct interest" in the dispute so as to make the non-striking employees ineligible for unemployment benefits under the statutory plan.

██ The commission did so find. It is apparent that the circuit court viewed the evidence as capable of supporting a contrary finding, and the court failed to give the requisite deference to the administrative determination. As noted above, the court must view the evidence in the light most favorable to the findings and decision of the commission and must disregard all opposing and unfavorable evidence, *Neeley,*

2. The commission, having adopted the appeals referee's decision, was convinced that the vacation issue was neither a principal issue nor one which would have directly benefited the claimants or other members of the non-striking unions even if the Teamsters had been successful in negotiating the issue. Its finding on the issue follows:

"The Referee is not convinced that the issue involving a fifth week of vacation for certain employees with seniority was a principal is-

sue between the striking union and the employer and if the striking union had been successful in its negotiation on the fifth week of vacation issue benefiting some of their members and thereafter some of the claimants or members of the unions to which they belonged amounted to a direct interest in the labor dispute by the claimants or members of the unions to which they belonged under the above provisions of the Missouri Employment Security Law."

*supra*, 379 S.W.2d at 204. To repeat, if the evidence would warrant either of two findings, the court is bound by the commission's determination, and it is irrelevant that there is supportive evidence for the contrary finding. *Board of Education, Mt. Vernon Schools, supra*, 542 S.W.2d at 782.[3] The commission's finding that the non-striking employees were not directly interested in the Teamsters' labor dispute was supported by substantial and competent evidence and was not clearly against the overwhelming weight of the evidence.

## B

The commission also found that the claimants and other members of the ten non-striking unions were not of the same grade or class as the Teamsters dockmen, under § 288.040.5(1)(b), RSMo 1978.[4] The commission found that claimants were skilled and highly skilled members of ten different trade and craft unions, performing various services ranging from those of reporters and photographers to switchboard operators and bookkeepers. The duties of the striking Teamsters dockmen, on the other hand, consisted entirely of such unskilled labor as loading and unloading newspapers into trucks on the employer's docks and loading platforms. The commission found no interchange of duties between the unskilled Teamsters dockmen and the members of the ten non-striking skilled and highly skilled trade and craft unions. Beyond this difference in skills, the commission found that each of the ten non-striking unions had an individual contract and separate contractual terms concerning wages, hours of work and conditions of employment, differing from those of the striking Teamsters.

The employer contends that the nearly 2,000 non-striking employees from the ten skilled trade and craft unions were of the same grade or class as the 32 striking Teamster's dockmen, citing *O'Dell, supra.* The employer's reliance on *O'Dell* is misplaced because the legal issues and facts of that case are markedly different from those presented in the instant case. *O'Dell* dealt with the question, where an automobile manufacturer has two divisions in the same building with merging assembly lines, whether a strike in one division constituted

3. Rather than disregard all opposing and unfavorable evidence, the dissent marshals supporting evidence for a contrary finding. Even assuming that supportive evidence for a contrary finding may be found, since the evidence would warrant either the commission's determination or the dissent's determination, the court is bound by the commission's determination.

Further upholding the commission's determination are the following facts in the record: (1) In prior negotiations with one of the non-striking unions, the employer stated that under no circumstances would it give employees a fifth week of vacation. (2) There was some evidence that the vacation issue was only one of more than 40 issues mentioned by the parties to the negotiations. (3) In its progress reports to the other unions, the Teamsters did not list the vacation issue as an issue in negotiation. Rather, the Teamsters informed the other unions that the main issues concerned "the manning at the Dunlap plant" and the "loading inside of trucks". (4) There were contradictions in the interpretations the parties gave to the terms of the employer's offer in regard to the vacation issue and, hence, there were serious questions as to the enforceability, if any, of the promise. The employer's assistant director for labor relations referred to the offer as an "option". One union stated that the offer was communicated to it as valid only for those with 25 years' seniority, while others understood the offer to be valid for those with 10 years' seniority. Other unions denied that either the employer or a non-striking union would be bound by the Teamsters' collective bargaining agreement.

4. In *Poggemoeller v. Industrial Commission*, 371 S.W.2d 488, 498–500 (Mo.App.1963), the court of appeals held that whether an employee participates or has a direct interest in a labor dispute, and whether a work stoppage has occurred as a result of a labor dispute, were questions of fact for the commission. Although it has never been judicially determined in this state, it logically follows that the remaining condition in the statutory proviso, whether an employee is in the "same grade or class" as the striking employees, is a question of fact for the commission. When faced with this question, the Colorado Supreme Court held that whether an employee is in the "same grade or class" is a question of fact. *Orr v. Industrial Commission*, 188 Colo. 173, 534 P.2d 785, 790 (1975).

a stoppage of work in the factory where employees of the other division were employed. At issue in *O'Dell* was a construction of the "stoppage of work" subsection of the Employment Security Law, now § 288.040.5(2), RSMo 1978, and *O'Dell* did not address the construction of the "same grade or class" language in § 288.040.5(1)(b), RSMo 1978.

In *O'Dell*, employees of the two divisions belonged to the same local union, which was the exclusive bargaining agent for all general wage rates and pay increases. When the employees in the one division went on strike, the employees in the other division honored the strike. Employees of both divisions worked side by side on the production line where the two assembly lines merged. The two divisions were closely coordinated as to work, number of shifts, reduction of forces on either side, close-downs for inventory, vacations or material shortages. The court concluded "that the building, place, location and premises where the Chevrolet Division employees and the Fisher Body Division employees were working was a single automobile factory, and that the factory where claimants were employed was the same factory in which the work stoppage arising out of a labor dispute occurred." 376 S.W.2d at 145. The court then summarily upheld the commission's determination that the claimants failed to show that they did not participate in the labor dispute, that they were not financing the strike, that they were not directly interested in the dispute and they were not of the same grade or class as the strikers. As to the issue of "same grade or class," the court merely upheld the commission's determination that employees belonging to the same union, doing essentially the same type of work side by side on the same assembly line, were of the same grade or class.

Unlike the facts in *O'Dell,* in the case at bar none of the claimants was in the same union as the striking Teamsters dockmen, none performed the same work, none worked side by side with the Teamsters nor were represented by the same bargaining agent. The claimants in the instant case are members of skilled and highly skilled trade and craft unions, unlike the striking Teamsters, who performed unskilled manual labor in loading finished newspapers into trucks on the dock area of the employer's plants. Furthermore, the claimants and other members of the non-striking unions refused to honor the Teamsters' strike. There was ample support in the record for the commission's finding, that the non-striking employees were not of the same grade or class as the striking Teamsters dockmen.

## C

In conclusion, the commission found that the claimants and other members of the non-striking unions were not participating in, financing, or directly interested in the labor dispute and were not members of the same grade or class of the workers participating in or financing or directly interested in the dispute which caused the stoppage of work. The commission, therefore, determined that the claimants were not ineligible for unemployment benefits. The commission's findings and decision were based on substantial and competent evidence and were not clearly against the overwhelming weight of the evidence. The circuit court improperly substituted its judgment for that of the commission. We, therefore, reverse the decision of circuit court and remand the case for a reinstatement of the commission's order and any further necessary proceedings not inconsistent with this decision.

Reversed and remanded.

BARDGETT, C. J., and MORGAN and HIGGINS, JJ., concur.

WELLIVER, J., dissents in separate dissenting opinion filed.

DONNELLY and RENDLEN, JJ., dissent and concur in separate dissenting opinion of WELLIVER, J.

WELLIVER, Judge, dissenting.

I respectfully dissent.

The principal opinion would reverse the judgment of the Circuit Court of the City of St. Louis that the account of respondent, Pulitzer Publishing Company (hereinafter, "Pulitzer") with the Division of Employment Security should not be charged under § 288.070.7, RSMo 1978, with the payments made by the Labor and Industrial Relations Commission, (hereinafter, the "Commission") to nonstriking employees of Pulitzer during the suspension of publishing operations at Pulitzer's plants growing out of the Teamsters' dockmen's strike of August to October of 1973. The question whether Pulitzer's account should be charged with the payments made by the appellant Commission during the work stoppage depends on whether the claimants were ineligible for benefits under § 288.040.5, RSMo 1978. The trial court found that the nonstriking individual claimants were ineligible for benefits as a matter of law because they were "directly interested" in the outcome of the Teamsters' negotiations. In an opinion by A. Stockard, Sp. J., filed July 3, 1979, a panel of the Court of Appeals, Eastern District, unanimously would affirm the judgment of the circuit court. In my opinion, the judgment of the circuit court was correct and should be affirmed. The opinion which follows uses much of the language and analysis found in the opinion of the court of appeals, without benefit of quotation marks.

It should be noted at the outset that the individual claimant-employees who received unemployment compensation because of the suspension of production by Pulitzer will keep the compensation paid to them regardless of the outcome of this appeal. § 288.-070.6, RSMo 1978. Consequently, although the "claimant-employees" as a group have appealed from the judgment of the circuit court, they have no interest in the outcome of this litigation. There is, however, a justiciable controversy between the Commission and Pulitzer because in the event Pulitzer prevails in this appeal, its account with the Division of Employment Security will not be charged with the payments made to claimants, § 288.070.7, RSMo 1978, and the amount of charges against Pulitzer's account affects the tax rate it must pay, under §§ 288.113 to 288.123, RSMo 1978.

The Commission found that the claimants were unemployed due to a stoppage of work which existed at the premises where they were last employed, and which was caused by a labor dispute between Pulitzer and Teamsters Local 610. This finding is supported by substantial evidence. It is of no consequence that the unemployment of claimants was directly precipitated by the action of Pulitzer in suspending publication of its newspaper. The underlying cause of the work stoppage was the labor dispute. *Adams v. Industrial Commission*, 490 S.W.2d 77, 80–81 (Mo.1973); *Poggemoeller v. Industrial Commission of Missouri*, 371 S.W.2d 488, 500 (Mo.App.1963).

The Commission also found that nonstriking claimants belonged to "skilled or highly skilled unions" and "were not of the same grade and class as the members of the union engaged in the labor dispute." Consequently, the Commission found that they were not ineligible for benefits by reason of § 288.040.5(1)(b), RSMo 1978.

One of the issues under negotiation between Pulitzer and Teamsters Local 610 was whether employees with ten years' seniority would be given a fifth week of vacation. Pulitzer had agreed to give all of its employees with ten years seniority a fifth week of vacation if it gave such benefits to the striking Teamsters. Pulitzer contends that this agreement gave the nonstriking employees a "direct interest" in the labor dispute under § 288.040.5(1)(a), RSMo 1978. The Commission adopted the finding of its referee that Pulitzer "had either orally or in writing or by both means agreed with these unions [the ones to which claimants belonged] that if any other union did successfully negotiate an agreement in relation to the fifth week vacation issue that each of the unions would receive a like agreement on the issue for their members." The Commission's referee made the additional finding, however, that he was "not convinced that the issue involving a fifth week of vacation for certain employees

with seniority was a principal issue between the striking union and the employer," and that he was not convinced that Pulitzer's oral and written agreements to extend to each of the members of the nonstriking unions the fifth week of vacation for employees with ten years' seniority "amounted to a direct interest in the labor dispute by the claimants or members of the unions to which they belonged."

The trial court ruled that the Commission's conclusion that claimants had no "direct interest" in the labor dispute that caused the stoppage of work was "inconsistent with the facts and at variance with the judicial construction of the phrase." It also ruled that the Commission's conclusion "that claimants were not of the same class as the striking dockmen is in conflict with judicial interpretation of that term." I agree with the trial court on both issues.

The Commission found as a fact that there was an agreement with all the other unions to which claimants belonged that if the fifth week of vacation was granted to one union, it would be granted to all. It is true that there was conflicting evidence as to this fact issue, but the finding of the Commission is amply supported by substantial evidence, and therefore it is binding on the reviewing court. § 288.210, RSMo 1978. The Commission also found that if the negotiation for the fifth week of vacation time had been successful, the results would have benefitted "some of the claimants or members of the unions to which they belonged."

Robert A. Steinke, Executive Secretary of the St. Louis Newspaper Guild, Local 47, identified Employer's Exhibit 12, and testified that it was marked "Memorandum of Understanding," dated April 5, 1972, that it was a document that pertained to vacation schedules, and particularly, to a fifth week of vacation, and that it was signed on behalf of the St. Louis Newspaper Guild, by Mr. Wippold, then president of the St. Louis Newspaper Guild. That agreement provided that if any union obtained a fifth week of vacation, the same "shall also be provided" to employees who are members of the Guild.

Marvin Kanne, Director of Labor Relations of the St. Louis Globe-Democrat, identified Employer's Exhibit 13, and testified that it was a letter dated April 27, 1973, that it was written as a result of an agreement regarding the fifth week of vacation issue reached during negotiations with St. Louis Typographical Union, Local 8, prior to its current contract. Raymond T. Nelke, President of St. Louis Typographical Union, Local 8, testified that he requested that the letter be written.

Mr. Kanne identified Employer's Exhibit 15, as a letter dated September 1, 1972, and testified that the letter was written as the result of an agreement regarding the fifth week of vacation issue reached during negotiations with International Association of Machinists, District 9. Mr. Roy D. Hawkins, a business representative of the International Association of Machinists and Aerospace Workers, District 9, (IAM), testified that the letter represented an agreement reached in meetings with representatives of Pulitzer. Mr. Hawkins testified that he received the letter on September 1, 1972, and that it reflects an agreement previously reached between IAM and the representatives of Pulitzer in bargaining sessions and that the letter was written at the request of Mr. Hawkins.

Mr. Kanne testified that Employer's Exhibit 14, was a letter dated October 6, 1972, and that it was written as the result of an agreement concerning the fifth week of vacation issue reached during negotiations with St. Louis Paperhandlers and Electrotyper's Union, Local 16. The President of that union, William Aubuchon, testified that the letter was an offer made by Pulitzer, that it confirmed Pulitzer's position but did not confirm the union's position, and that Aubuchon could not recall whether he had requested that that letter be written.

Mr. Kanne testified that agreements such as those reflected in Employer's Exhibits 12 through 16 were made with each of the other unions regarding a fifth week of vacation. He testified that in those cases where letters were requested by the unions

they were written, and that in the other cases no letter was sent. Mr. Kanne's testimony regarding the existence of written agreements on the fifth week of vacation issue was not contradicted. With respect to unwritten understandings with the other unions regarding the fifth week of vacation issue, the evidence was as follows.

Charles R. Witt, Vice President of Graphic Arts International Union, Local 505, testified and presented no evidence to contradict Kanne's testimony regarding an oral understanding concerning the fifth week of vacation.

Carl N. Stuard, Special Representative of the International Brotherhood of Electrical Workers, Local 1, testified, but could not recall whether or not an oral agreement concerning the fifth week of vacation had been made with that union.

William F. Metz, Jr., President of St. Louis Mailers Union, Local 3, testified that there was no oral agreement reached between his union and Pulitzer regarding the fifth week of vacation, and indicated that his union did not want Pulitzer to send a letter confirming the existence of such an agreement. Mr. Kanne testified that such an agreement did exist.

The foregoing evidence was sufficient to support the referee's finding that Pulitzer had made an *agreement*—and not merely an "unsolicited unilateral offer"—that if any union obtained a fifth week of vacation, the same would be provided to employees who are members of the other unions.

In an apparent attempt to avoid the inevitable result which would necessarily flow from what it found to be the facts, the Commission declared that it was "not convinced" that the issue involving a fifth week of vacation was "a principal issue between the striking union and the employer," and its ultimate decision that claimants

had no direct interest in the labor dispute seems to be premised upon this finding. Whether this is permissible in view of the findings of fact by the Commission is a question of law reviewable by this Court.

I am not convinced that the evidence supports the determination that the vacation demand was not a principal issue; in fact that finding appears contrary to the overwhelming weight of the evidence. At the beginning of the negotiations there were many issues. The issue of the additional vacation period remained unresolved until the final day of the strike. However, whether the vacation issue was a "principal issue" or not is irrelevant to the outcome of this case. Perhaps the vacation issue was, as the principal opinion suggests, merely one item on a "laundry list" or one of many "bargaining chips" which the striking dockmen expected to be "expended in the bargaining process." However, there is no statutory basis for finding a nonstriking employee eligible for unemployment benefits when that employee has a direct interest in the dispute, merely because the issue in which the employee has an interest is not a "principal issue" in the negotiations. Section 288.040.5(1), RSMo 1978, makes no such distinction. We are not at liberty to create eligibility for benefits through judicial legislation.

Despite the Commission's finding that Pulitzer had agreed with the nonstriking unions that the fifth week of vacation would be granted to all the unions if it was granted to one union, the Commission found claimants eligible for benefits.[1] The circuit court found the claimants were ineligible for benefits under § 288.040.5(1)(b), RSMo 1978, on the ground that they belonged to "a grade or class of workers of which . . . there were members employed at the premises . . . [who were] directly interest-

---

1. The Industrial Commission did not consider whether the act of the St. Louis Newspaper Guild in posting notices that it "would sanction picket lines of Local 610" constituted participating in the strike within the meaning of § 288.040.5(1)(a), RSMo 1978. The stated purpose was to permit members of the Guild to refuse to cross the picket lines. Voluntary re-

fusal to cross a picket line by a nonstriking employee does constitute participation. *Meyer v. Industrial Commission of Missouri*, 240 Mo. App. 1022, 223 S.W.2d 835, 838 (1949). Also, when the Guild instructs its members not to cross a picket line it constitutes participation. *Basso v. News Syndicate Co., Inc.*, 90 N.J.Super. 150, 216 A.2d 597, 605–06 (1966).

ed in the dispute." I would affirm the judgment of the circuit court in this regard. If some of the members of the unions to which claimants belonged were directly interested in the dispute, then those members constituted a "class of workers" within the meaning of the statute. Nothing in the applicable statutory provisions authorizes a contrary determination.

In reversing the circuit court's judgment and finding the claimants eligible for benefits, the principal opinion concludes that the employees who had an interest in the fifth week of vacation did not constitute a grade or class of workers in the sense contemplated in § 288.040.5(1)(b), RSMo 1978. The principal opinion reaches this result by focusing attention on the types of duties and functions that the striking and nonstriking employees performed. Contrasting the skilled and highly skilled character of the nonstriking claimant-employees with the unskilled character of the striking dockmen, the principal opinion concludes that "[t]here was ample support in the record for the commission's finding, that the non-striking employees were not of the same grade or class as the striking Teamsters dockmen." In drawing this conclusion, the principal opinion vigorously distinguishes *O'Dell v. Division of Employment Security*, 376 S.W.2d 137 (Mo.1964) on the ground that both the striking and nonstriking employees in *O'Dell* had similar duties, worked side by side, and had the same bargaining agent. This attempt to say that the class of workers who would gain a contractual right to a fifth week of vacation upon attaining ten years' seniority if the striking dockmen won that benefit was not a class because they shared little else in common with the dockmen emphasizes irrelevant differences to the exclusion of relevant similarities.

The determinative question is whether, under the factual situation as found and determined by the Commission, claimants were "directly interested" in the labor dispute within the meaning of § 288.040.5(1), RSMo 1978. In *Poggemoeller v. Industrial Commission of Missouri*, 371 S.W.2d 488, 505 (Mo.App.1963), it is stated that "[a] claimant is directly interested in the labor dispute when he stands to gain or lose by the outcome of the dispute," and "when his wages, hours or working conditions will be affected by the outcome of the dispute." The findings of fact by the Commission in this case clearly establish as a matter of law that claimants each have a direct interest in the labor dispute that brought about the stoppage of work.

In its brief before this Court, the Commission contends that it "would be unwise to set a legal precedent that an employer by making an unrequested unilateral offer to a union could thereby on his own create a direct interest on the part of the members of such union to a labor dispute with another union." The argument that the direct interest here involved was unilaterally created by Pulitzer, and that it was a mere offer, contradicts the Commission's finding that there were in fact oral or written *agreements* with the unions to which claimants belonged pertaining to the additional vacation time. The principal opinion adopts the Commission's argument nearly verbatim. The principal opinion surveys the evidence contrary to the Commission's finding that Pulitzer had agreed to extend the vacation benefit to all the unions if it gave that benefit to one union, and concludes that "[t]he commission could have considered that any direct benefit to claimants from the vacation issue was speculative." In effect, the principal opinion takes the position that the Commission's legal conclusion on what constitutes a "direct benefit" is binding on this Court, but that the Commission's factual finding that Pulitzer had agreed orally and in writing to extend the vacation benefit to all its employees if it gave the benefit to the Teamsters is not binding on this Court. This position inverts the normal standard for judicial review of administrative action. The circuit court held that the Commission's factual finding was binding on it. Perhaps, under the evidence, the Commission could have found that no oral agreements existed, but it did not do so. In fact, it found to the contrary. However, assuming it had found no oral agreements, the above argument of the

principal opinion and of the Commission disregards the finding of the Commission that with some of the unions Pulitzer had entered into a *written* agreement pertaining to additional vacation time.

The Commission also argues that its finding that claimants were not "directly interested" in the labor dispute is a finding of fact, and as such is binding on this Court. It cites *Poggemoeller v. Industrial Commission, supra.* The circumstances of this case clearly distinguish it from the *Poggemoeller* case. Here, the Commission found as a fact that in the event the striking union was successful in its demand as to the vacation issue it would benefit "some of [the striking union's] members and thereafter some of the claimants or members of the unions to which they belonged." The Commission erroneously determined that because the issue involving a fifth vacation week was not a "principal issue" in the negotiations with the striking dockmen, the nonstriking claimants were not "directly interested" in the labor dispute which caused the work stoppage. Whether the Commission made a correct application of law to the facts is an issue of law which is subject to judicial review.

I would hold that the claimants, as members of unions with which the employer had agreed to extend the benefits of the additional vacation period if incorporated into the contract with Teamsters Local 610, as found by the Commission, were "directly interested in the labor dispute which caused the stoppage of work" as that term is used in § 288.040.5(1), RSMo 1978, and were therefore ineligible to receive unemployment benefits. Consequently, I would affirm the judgment of the circuit court that Pulitzer's account with the Division of Employment Security should not be charged with the payments made by the Commission during the work stoppage.

In conclusion, I would dismiss the appeal by the claimant-employees because there is no justiciable controversy as to them. I would affirm the judgment of the circuit court as to the appeal brought by the Commission.